No. 24717.

THE PEOPLE OF THE STATE OF COLORADO *v.* JOHN GURULE
AND GEORGE GURULE.
(471 P.2d 413)

Decided June 22, 1970.

160

JAMES D. MCKEVITT, District Attorney, GREGORY A. MUELLER, Assistant, EDWARD A. SIMONS, Deputy, for plaintiff-appellee.

TRUMAN E. COLES, Assistant State Public Defender, MICHAEL L. BENDER, Deputy, for defendant-appellant John Gurule.

JOHN KOKISH, for defendant-appellant George Gurule.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

THIS is an interlocutory appeal under C.A.R. 4.1 from a decision of the District Court in and for the City and County of Denver denying the defendants' motion to suppress evidence.

The defendants are charged jointly with second degree burglary and theft.

In the early morning of February 26, 1969, two false fire alarms were made from fire alarm boxes at 851 Elati, near West High School, and at 10th and Santa Fe, a few blocks away. The false alarms were reported to the police department and within about ten minutes two Denver patrolmen were in the area looking for suspects. The making of a false fire alarm is an offense under the ordinances of the City and County of Denver.

While heading north on Fox Street from 8th Avenue, within one block of West High School, the officers, "looking for suspects or anyone, someone that could be linked with pulling the false alarms," observed the two appellant-brothers walking on the west side of the street. The police drove past the appellants, then stopped the car and backed it up. Officer Alengi, who was driving, called to the two suspects to stop, but they ran between two houses. The officers gave chase and apprehended the two hiding between two garages on the east side of an alley two or three houses north of where the patrol car stopped. The two suspects were "frisked" for weapons, placed in the police car and taken to police headquarters.

Officer Shayler testified:

"* * * [T]hese two individuals were placed in the back seat of the police car and we wasn't sure why they had run. So they wasn't handcuffed; they was just placed in the back seat and I was riding on the passenger side. I was looking in the back and I noticed — first I heard, it sounded like maybe leaves in the back of the car, which I thought possibly it was — maybe with their feet on — and kind of shuffling sound. And I looked back over my shoulder and I noticed the party John was stuffing something down between the seat, the back of the seat

and the front of the seat. I thought it was a handkerchief at the time; it was a white object."

At the police station the suspects were put into separate interrogation rooms. Officer Alengi was with George Gurule and he testified:

"* * * I had him [George] empty his pockets out on a table and took out, I believe it was two hundred and seventy-five dollars cash rolled up in one lump * * *."

Officer Shayler followed the same procedure as his partner and found on John Gurule:

"* * * I think there was three one dollar bills and some odd change, and a pocket knife, and I believe that was all he had."

Officer Shayler then searched the police car "to see what they had put in the back seat and under the front seat of the police car I found about two hundred and seventy-some dollars in bills; some twenties, fives and ones." When he pulled the back seat up he found a small white sack containing approximately five dollars in change. This sack was identified the morning of February 26 as having been stolen in the burglary of El Molino Foods, Inc., 1078 Santa Fe Drive, the night before.

It was undisputed that the police were acting without an arrest warrant or a search warrant; that they had no description of the person or persons setting off the false alarms, and that they had no personal knowledge of the identities of or any police record on the Gurule brothers.

The motion to suppress was based on the defendants' contentions that (1) the arrest was illegal for lack of probable cause and therefore the seized items were "fruits of the poisonous tree"; and (2), the property was not "abandoned" but, if it were, it was "abandoned" incident to an illegal arrest. (Note: Although not argued by the defendants, it would be implicit in (2) that if the property were considered in "plain view" they would argue the police had no right to be in that position to view the evidence because the arrest was illegal.)

The court ruled:

"* * * [T]hey were found hiding in the alley in the vicinity between two garages; that at this time the officers' suspicions, coupled with what had taken place and the acts of the Defendants, were certainly enough to justify them in taking them into custody; and they did, in fact, do this, putting them in the police car. * * *

 * * * *

"The Court would find and determine, based upon these findings of fact, that Defendants had no standing upon which to raise that Motion to Suppress, based upon the case laws as the Court understands it in this case. And the Motion to Suppress would be and hereby is denied."

The defendants argue that,

"* * * It is patently clear that the arrest of appellants was in violation of the Fourth Amendment in that appellants were arrested on suspicion and not on the basis of probable cause. Appellants submit that the *Gallegos* case * * * [Gallegos v. People, 157 Colo. 173, 401 P.2d 613] and well-established search and seizure principles dictate that this court reverse the trial court's denial of appellants' Motion to Suppress."

 In order to sustain the ruling of the trial court it will be necessary to demonstrate that the factual situation here is sufficiently different from that in *Gallegos, supra,* to justify the conclusion that the police officers acted lawfully in taking the defendants to the police station for interrogation. If the arrest at the point of apprehension was a valid arrest then the subsequent searches and seizures were likewise valid because they were incident thereto and the court's ruling was correct. *Baca v. People,* 160 Colo. 477, 418 P.2d 182.

In *Gallegos,* Mr. Justice Pringle, speaking for the court, outlined these critical facts:

"The officers testified that they had no reason to believe Gallegos had any marijuana in his possession, nor did they have information that any crime had been committed in the area by anyone resembling Gallegos or that any crime was in the process of being committed. They

had never seen Gallegos before, had no knowledge of any prior criminal record and only had a suspicion that he might be engaged in possible criminal activity."

The present factual situation at first blush may appear to be very close to that in *Gallegos,* but a closer view discloses some important differences. In the first place, the area of the arrest was a residential neighborhood where, at one o'clock a.m., there normally would be no one abroad in the streets. The officers knew that a crime had been committed in the area. Within a short span of time of the report of the offense they observed two young men within a block or two of one of the two fire alarm boxes that had been "pulled." When requested by one of the officers to stop so the officers could question them, the two defendants turned, ran, and attempted to hide in order to avoid interrogation. After apprehending them the officers took them to police headquarters where they could be more conveniently interrogated.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, Mr. Chief Justice Warren noted that,

"* * * Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. * * *"

 This responsibility places a great burden on the courts. Not only must we guard against police conduct which is overbearing or harassing, to protect the constitutional rights of the individual, but we must guard against restrictions on the police which impede or prevent reasonable investigative procedures designed to further efficient law enforcement in the interest of all the people.

In *Terry,* where the United States Supreme Court approved the right of police officers to "stop" and "frisk" a citizen without probable cause to arrest, Mr. Chief Justice Warren stated,

"* * * The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initi-

ation permissible. *Warden v. Hayden,* 387 U.S. 294 \* \* \*." We recognize our responsibility to apply the same standard to the seizure or arrest of the defendants.

*Terry* also requires that the police officer "\* \* \* must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. \* \* \*" The court continues:

"\* \* \* The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. \* \* \*"

Each case must be tested on its own particular facts. The test is reasonableness under the circumstances. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730; *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777; *Roybal v. People,* 166 Colo. 540, 444 P.2d 875. *Terry* teaches that "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? \* \* \* *Carroll v. United States,* 267 U.S. 132 (1925); *Beck v. Ohio,* 379 U.S. 89, 96-97 (1964)."

The same court in *Beck v. Ohio, supra,* quoted the following pertinent language from *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879:

"The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating ... often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

Also, see *Lucero v. People,* 165 Colo. 315, 438 P.2d 693, *cert. denied* 393 U.S. 893, 89 S.Ct. 217, 21 L.Ed.2d 173.

Paraphrasing Mr. Justice White in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, the question for our determination is whether the "seizure" of the two defendants was "unreasonable" when tested by the need to arrest under the exigencies of the situation against the invasion of privacy which the arrest entails.

To begin with, it seems perfectly clear that the facts of this case negate any suggestion that the officers should have obtained a warrant before proceeding to search the area for the person or persons who activated the fire alarms.

At the time of the initial contact between the officers and the defendants, the officers very properly attempted to stop them. There is nothing unreasonable in police officers conducting threshold questioning of persons who are abroad late at night in an area where a criminal offense is known to have been recently committed. *State v. Baxter,* 68 Wash. 2d 416, 413 P.2d 638; *People v. Martin,* 46 Cal. 2d 106, 293 P.2d 52.

The actions of the defendants in fleeing and attempting to hide from the officers is a circumstance from which the officers may reasonably draw the inference that defendants were involved in the offense which the officers were investigating. *State v. Baxter, supra; People v. Martin, supra.*

It is clear that, under the circumstances of this case, a cautious man could justifiably believe that the defendants were involved in the offense under investigation. *Scott v. People,* 166 Colo. 432, 444 P.2d 388.

After the two brothers fled to avoid interrogation, it was a reasonable precaution on the part of the officers, especially in view of the hour of the day, to take the suspects to the less risky environs of the police station to interrogate them.

We hold that under the circumstances of this case the "seizure" or arrest of the defendants was not an unreasonable intrusion into their privacy, when weighed

against the exigencies of the situation with which the officers were confronted and the public interest in the apprehension of law violators.

*Terry* recognized the validity of one investigative technique — "stop" and "frisk" — but it did not rule out other investigative procedures. We think that the arrest or detention, under circumstances such as we have here, for the purpose of interrogation is not an unreasonable intrusion of the privacy of the citizen in violation of the Fourth Amendment. They would be protected by their Fifth Amendment rights at all times.

When citizens, under the circumstances of this case, conduct themselves as defendants did, bringing the arrest upon themselves by running and hiding, it is not too great an indignity to require them to be taken to the station house to explain their conduct, subject to their right to remain silent.

As indicated at the outset, if the initial arrest of the defendants was valid then the subsequent searches of the defendants and the police car and the resulting seizures of the evidence linking the defendants to a criminal offense were likewise valid as incident to the arrest. Having held the arrest valid, it is not necessary to meet the issue of whether the property found in the police car was "abandoned" or "in plain view" and admissible regardless of the legality of the arrest.

The judgment is affirmed.

MR. JUSTICE DAY and MR. JUSTICE GROVES concur in result.

MR. JUSTICE PRINGLE not participating.