No. 24554.

RORY CONDON AND RUTH A. PAHKALA *v.* THE PEOPLE OF
THE STATE OF COLORADO.

No. 24899.

THE PEOPLE OF THE STATE OF COLORADO *v.*
ROBERT TIMOTHY SCULLY.
(489 P.2d 1297)

Decided October 26, 1971.

DONALD P. MACDONALD, for plaintiffs in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, GEORGE E. DeRoos, Assistant, for defendant in error.

JAMES D. McKEVITT, District Attorney, GREGORY A. MUELLER, Assistant, JARVIS W. SECCOMBE, Chief Deputy, THOMAS P. CASEY, Deputy, for plaintiff-appellee.

DONALD P. MACDONALD, for defendant-appellant.

*En Banc.*

DONALD P. SMITH, District Judge,* delivered the opinion of the Court.

THE question of the validity of the search and seizure of evidence involved in these cases is identical in each case, and arises out of precisely the same occurrence. This·court has combined these cases on appeal. Scully is before this court on Interlocutory Appeal from an ad-

verse ruling by the trial court on his motion to suppress this evidence. Condon and Pahkala are before this court on Writ of Error directed to the judgment of the trial court denying their motion to suppress. At their trial, Condon and Pahkala were each convicted of various drug violations and received sentences. A rather thorough examination of the facts involved is necessary for a determination of this issue.

Sometime prior to June, 1968, the defendants rented the premises located at 1050 South Elmira Street, Denver, Colorado, from a real estate agent acting on behalf of the owner, one Mr. Chance. Early in June, 1968, Mr. Chance had occasion to view these premises and noticed the lawn around the house was burned and in need of care. After learning that the water could not be turned on through the outside taps, Mr. Chance went to the house, on June 23, 1968, to turn on the water from inside the house. He decided then to examine the house and, while viewing the back of the house, detected an odor which he thought could be that of a decomposing body coming from the two basement windows. He called the police for assistance and Officers Bott and Kinnard responded. They also detected the odor which they opined could be that of a decomposing dead body and called Sergeant Torsney, who arrived and made the same observation.

A decision was made to enter the house with the permission of Mr. Chance. After trying unsuccessfully to enter the premises with Mr. Chance's key, the police broke in through the glass in the back door. Up to this point, neither Mr. Chance nor the police had any suspicion that a crime had been committed on the premises and testified that they were not looking for evidence of a crime at this time. The police entered the house at the request of Mr. Chance, whom they instructed to sit in his car, as this was a police matter. Subsequently, however, Mr. Chance returned to the house and heard the police officers walking through upstairs bedrooms and

then observed them searching the living room where they discovered a glass which they suspected contained marijuana. The police then searched the hall closet, where they found pipes, which, according to the police, were used to smoke hashish. Finally, the officers searched the basement where they had initially detected the odor of the possible decomposing body and observed several stacks of cases along the west wall. Plastic or rubber hoses were observed leading from the bathroom to two basement rooms which were padlocked. The testimony is in conflict as to whether these locks were broken and the rooms were opened before or after the Vice-Squad was called and responded to the scene, but prior to the arrival of the Vice-Squad the officers expanded their search to the attic and the garage. After the arrival of the Vice-Squad, the two basement rooms were searched and the federal officers were called because of the uncertainty of those present concerning the nature of the chemicals and apparatus discovered in the search. The federal officers advised the detectives that the chemicals could be used to produce mescaline. At *this* point in time, some hours after the original entry, one of the detectives prepared the necessary affidavits to obtain a search warrant. The search warrant was obtained and the evidence involved in these cases was seized. No decomposing body was ever found, the odor apparently coming from the various chemicals which were found. Three days later the defendants were arrested when they returned to the premises at 1050 South Elmira.

 Although several arguments have been advanced by the parties relative to this search and seizure, the decisive issue is whether the odor of a dead body is an emergency in the sense that a policeman or other government official does not need a warrant to enter a private residence to search for the source of that odor. In this regard, the defendants have argued essentially that this was a search that was administrative in nature

rather than criminal and that no emergency existed sufficient to justify the warrantless search. The People argue that the odor of a decomposing body is sufficient to justify the police in searching without a warrant, since lives could be in immediate danger under these circumstances. They also argue that because the consent of the owner of the property, Mr. Chance, was obtained, there was no necessity of obtaining a warrant. For reasons which follow, we determine today that detection of an odor which might be that of a decomposing body does not create, *in and of itself*, an emergency sufficient to justify a warrantless search.

That the search conducted here was administrative in origin is not seriously disputed by the parties. All of the relevant testimony is to the effect that no criminal activity of any kind was suspected at the time of the forcible entry into the residence. The police officers testified only to their concern arising from the possible decomposing body inside and the health hazards attendant thereto. The question then becomes one of the applicable standards to be applied in an administrative search of this nature.

██ We stated in *Huff v. Police Court of the City of Colorado Springs*, 173 Colo. 414, 480 P.2d 561 (1971), a case involving alleged violations of the zoning ordinances of Colorado Springs, that,

"Whi e we do not decide this case on the civil-criminal proceedings distinction urged by the parties, we do note that the strong trend of authority is to afford the protections of criminal procedure to one charged with the violations of a municipal ordinance. *See Canon City v. Merris*, 137 Colo. 169, 323 P.2d 614; *Pickett v. City of Boulder*, 144 Colo. 387, 356 P.2d 489; *Austin v. City and County of Denver, Colo.*, 462 P.2d 600; *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930." The language used in the cases dealing with the administrative and criminal procedural distinctions is very similar, and the cases cited in them oftentimes overlap.

For example, the guarantees of the Fourth Amendment to the United States Constitution "against unreasonable searches and seizures" have been applied to both administrative and criminal searches. In *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the United States Supreme Court stated,

"Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant."

In support of this statement, the court then cited several cases, both criminal and those involving administrative type searches. The procedural differences involved, if any, however, are probably best summed up in further language from *Camara, supra:*

"We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime. * * * But we cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely 'peripheral.' It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior. For instance, even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security."

As indicated by this language, perhaps the "hostile" nature of the search is the only real difference in the case where a private dwelling is involved, since the intrusion on the "sanctity" of the home is certainly no less

an intrusion because the search is administrative rather than criminal in nature.

■ As the United States Supreme Court held in *Camara, supra,* then, an administrative search without a warrant is not proper except under certain circumstances and conditions. The People have argued that at least two of these conditions have been met. They argue (1) that an emergency existed sufficient to justify a warrantless search and, (2) that consent was given to search the premises.

■ In *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), the court stated,

"Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. * * * We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption of the constitutional mandate that the exigencies of the situation made that course imperative."

Recognizing this "emergency" or "exigency" doctrine, we stated in *People v. Gurule,* 172 Colo. 159, 471 P.2d 413 (1970):

"Each case must be tested on its own particular facts. The test is reasonableness under the circumstances. * * * Paraphrasing Mr. Justice White in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, the question for our determination is whether the 'seizure' of the two defendants was 'unreasonable' when tested by the need to arrest under the exigencies of the situation against the invasion of privacy which the arrest entails."

We are of the opinion that the odor of a decomposing body, however unpleasant and discomforting, does not give rise to an emergency in and of itself sufficient to allow an invasion of the privacy of the defendant's home without a search warrant. It would have been a small matter indeed, when weighed against the intrusion involved, for one officer to obtain a warrant, for which there was certainly probable cause, while another kept

the premises under surveillance if this was deemed necessary. There was no apparent danger to any person or property. To put the matter sharply, if there had been a decomposing body, there would be no hope of revival at any rate. It is also well to note here an incongruity in the police actions during the search. After testifying to their concern with the odor emanating from the two basement windows, the evidence then discloses that the basement was searched only after the upstairs bedrooms, the main floor, and the closets and cupboards on these floors had been searched. These preliminary searches were unwarranted under the circumstances and appear highly inconsistent with the original intent of the entry onto the premises.

■ The People then argue that even if the search was improper in all other regards, there was consent given by the owner to the search and it is, thus, a proper search. In *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the United States Supreme Court stated, in a case involving a search of the defendant's hotel room,

"It is important to bear in mind that it was the Petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent."

Here it was the constitutional right of the tenant defendants, who were the possessors of the premises which was at stake, not Mr. Chance's who owned the property. A landlord is not a proper person to give consent to the search of his tenant's residence. *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

■ Other arguments to the effect that the officers should not ignore that evidence which is in their "plain view" and that only certain items of those seized, if any, should be excluded have been made by the People. These arguments are moot at this point. The search was illegal at its inception and nothing intervening, including the

last minute obtaining of a search warrant, can render any part of the search legal. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed 319 (1920); *Wilson v. People,* 156 Colo. 243, 398 P.2d 35 (1965).

For these reasons, the judgment of the trial court in *Condon v. People,* No. 24554, and the ruling on the motion to suppress in *People v. Scully,* No. 24899, are reversed and remanded for further proceedings consonant with the views expressed herein.

MR. JUSTICE DAY not participating.

---

*District Judge sitting under assignment by the Chief Justice under provisions of article VI, section 5(3) of the constitution of Colorado.