**Michael Adam RAUSCHER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–01–01134–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 29, 2004.

Matt Hennessy, DeGuerin & Dickson, Houston, TX, for Appellant.

Donald W. Rogers, Jr., Assistant District Attorney, Charles A. Rosenthal, Jr., District Attorney—Harris County, Houston, TX, for Appellee.

Panel consists of Chief Justice SHERRY RADACK and Justices KEYES and ALCALA.

## OPINION

SHERRY RADACK, Chief Justice.

Appellant, Michael Adam Rauscher, pleaded guilty to the state jail felony of possession of marihuana after the trial court denied his pretrial motion to suppress evidence. Pursuant to a plea bargain agreement, the trial court assessed appellant's punishment at 12 months' confinement. In three points of error, appellant argues the trial court erred in denying

his motion to suppress evidence on federal and state constitutional grounds for the warrantless entry into his apartment.

We affirm.

## BACKGROUND

In March 2001, appellant and his wife, Tiffany Rauscher, were leasing Apartment No. E 315 of the Oakwood Apartments, located at 2424 South Voss, in Houston, Texas. On March 18, 2001, after numerous apartment residents complained of a foul odor coming from appellant's apartment, Jennifer Rivera, an Oakwood Apartments leasing consultant, attempted to contact appellant and his wife by phone. When Rivera was unable to make phone contact, she and another leasing consultant took a master key to appellant's apartment, then knocked on appellant's door and called aloud for a few minutes. When no one responded, Rivera and the other leasing consultant attempted to use the master key to enter appellant's apartment; however, because the locks were changed, they were unsuccessful.[1] During a second attempt a short while later, Rivera noticed white powdery footsteps outside appellant's door that she had not noticed the first time she went to appellant's door.

Rivera suspected that someone's safety may have been in jeopardy when she arrived at appellant's door and smelled the foul odor. A former police officer told Rivera that the odor smelled like a dead body. Rivera understood that there had been a recent break-up between appellant and his wife. Also, appellant had been seen at the apartments recently, but appellant's wife had not.[2] A more tenured employee advised Rivera to call the police and have them enter appellant's apartment.

Rivera, thereafter, contacted the police and informed them of the situation. In response to a "check on welfare" call, Houston Police Department Officer Zackery Becker arrived at Oakwood Apartments and located appellant's apartment. Several individuals informed Becker about the foul odor coming from the apartment, and that they were concerned about the resident or residents. Apartment managers told Becker that appellant and his wife had been heard arguing recently and that since that time, only appellant had been seen, but not his wife. Becker also smelled the foul odor coming from appellant's apartment, but he could not identify the smell.

After assessing the situation, Becker believed they were looking for a person. Based on his training and experience, Becker felt there was a possibility that somebody could be dead or injured in the apartment. Baker notified his supervisor, Sergeant McCardel, and received permission to enter the apartment with back-up.[3] The officers first tried yelling and knocking at appellant's door. When no one responded, the officers attempted to break in the door, without success. The officers then called the apartment complex maintenance staff to assist. Eventually, the maintenance staff drilled the lock out, and the officers then forced the door open.

Once the door was opened, the officers entered and searched the apartment room by room, checking for people. From the doorway of the apartment, Rivera could

---

1. Appellant's locks were changed without the acknowledgment of apartment personnel.

2. Rivera testified that a maintenance worker, Cedric Banks, reported this information to her.

3. Officers Down and Cicely provided back-up for Becker.

see cats and a large volume of cat feces.[4] At Rivera's request that they "make sure there's no dead body," the officers also checked the bathtub and the closet. No persons were in the apartment, but the officers saw a large number of marihuana plants in plain view in the apartment. The officers secured the apartment and notified HPD narcotics division and Animal Control. No evidence was removed from the apartment at that time.

Based on the fact that Becker observed marihuana plants in plain view during his entry into appellant's apartment, a search warrant was obtained. Pursuant to the warrant, officers re-entered appellant's apartment and seized the marihuana. The trial court, after finding that Becker entered appellant's apartment for the sole purpose of making a welfare check on the occupants, entered the following conclusions of law: 1) Becker's initial entry into appellant's apartment was pursuant to a call for service, which reasonably created a belief that an emergency existed; 2) Becker's initial observations while in the apartment were within the scope of looking for a person; 3) Becker's observations and recognition of the marihuana did not constitute an unreasonable search based on the totality of the circumstances; and 4) the marihuana that was seized after a search warrant was obtained was lawfully seized.

### DISCUSSION

#### 1. Standard of Review

In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review, giving "almost total deference to a trial court's determination of historic facts" and reviewing de novo the court's application of the law of search and seizure. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim.App.2000) (citing *Guzman v. State,* 955 S.W.2d 85, 88–89 (Tex.Crim.App. 1997)). If the issue involves the credibility of a witness, such that the demeanor of the witness is important, then greater deference will be given to the trial court's ruling on that issue. *Guzman,* 955 S.W.2d at 89. The amount of deference that we should give to a trial court's ruling on a motion to suppress will depend upon whether the trial court is in a better position to decide the issue before it. *Id.* If the issue is one of application of law to facts, and the ultimate resolution of that issue does not turn on an evaluation of credibility and demeanor of a witness, then we may review that issue de novo. *Id.* at 89. Furthermore, we will sustain the trial court's ruling admitting the evidence if the ruling is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State,* 117 S.W.3d 854, 856 (Tex. Crim.App.2003) (citing *Willover v. State,* 70 S.W.3d 841, 845 (Tex.Crim.App.2002)).

#### 2. The Warrantless Entry Into Appellant's Residence Was Valid Under The Emergency Doctrine Exception To The Fourth Amendment's Warrant Requirement.

In points of error one and two, appellant argues that the trial court erred when it denied his motion to suppress, because, appellant contends, an unidentifiable foul odor emanating from appellant's apartment did not justify warrantless entry under any exception to the Fourth Amendment to the United States Constitution. Here, appellant contends that an unidentifiable foul odor emanating from appellant's

---

4. She also saw carpet freshener piled up by the door and speculated that it was the source

of the white footprints near the door.

apartment did not justify warrantless entry under any exception to the Fourth Amendment. Specifically, appellant argues that warrantless entry was not justified under the emergency doctrine exception, alleging 1) there was no probable cause to search appellant's apartment, 2) no one identified a possible source of the foul odor coming from appellant's apartment, 3) there was no evidence of any crime or violence committed by appellant or in appellant's apartment, and 4) no emergency existed to justify the warrantless entry into appellant's apartment.

■■■ Both the Fourth Amendment to the United States Constitution, as well as Article I, Section 9 of the Texas Constitution, forbid unreasonable searches and seizures.[5] U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. Warrantless searches are per se unreasonable unless they fall under one of a few exceptions. *Kelly v. State*, 669 S.W.2d 720, 725 (Tex.Crim.App. 1984); *Brimage v. State*, 918 S.W.2d 466, 500 (Tex.Crim.App.1996) (plurality op. on reh'g). Under the emergency doctrine exception, police officers are not barred from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Janicek v. State*, 634 S.W.2d 687, 690–92 (Tex.Crim.App.1982); *see also Laney*, 117 S.W.3d at 861 (under the emergency doctrine, the officer has an immediate, reasonable belief that he or she must act to protect or preserve life or avoid serious injury).[6] If the emergency doctrine applies, the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Id.* at 862.

■■■ The burden of proof is on the State to justify the warrantless search of a residence. *Brimage*, 918 S.W.2d at 482; *Bray v. State*, 597 S.W.2d 763, 765 (Tex. Crim.App.1980). In order to justify the search of a residence under the emergency doctrine, the State must show 1) that the officers had probable cause to search the residence, and 2) that obtaining a search warrant was impracticable because the officers reasonably believed there was an immediate need to act in order to protect or preserve life or to prevent serious bodily injury. *Id; Bray*, 597 S.W.2d at 765. The State is not required to prove an actual emergency existed at the time of the officer's warrantless entry. *Id.* Rather, the State need only show that the facts and circumstances surrounding the entry and search were such that the officers reasonably believed that an emergency existed that made obtaining a search warrant impracticable.[7] *Id.*

■■■ We use an objective standard of reasonableness in determining whether a warrantless search is justified under the emergency doctrine. *Laney*, 117 S.W.3d at 862 (citing *Brimage*, 918 S.W.2d at 501). This objective standard looks at the police

**5.** "A person normally exhibits an actual, subjective expectation of privacy in their residence, and society is prepared to recognize this expectation as objectively reasonable." *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim.App.1991).

**6.** *Compare Torrez v. State*, 34 S.W.3d 10 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). In *Torrez*, the court stated that, standing alone, a telephone complaint to police that neighbors were "partying, drinking, and dis-

charging firearms into the air" did not present sufficient facts or circumstances for a reasonable officer to conduct a warrantless search of an individual's home. *Id.* at 16.

**7.** "The fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." *Laney*, 117 S.W.3d at 862 (citations omitted).

officer's conduct and "takes into account the facts and circumstances known to the police at the time of the search." *Id*; *see also Bailey v. State,*[8] 1999 WL 144091, *1 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (not designated for publication). Furthermore, we look to ensure that the warrantless search is strictly circumscribed by the exigencies that justify its initiation. *Laney,* 117 S.W.3d at 862.

As the Court of Criminal Appeals explained in *Laney,* the emergency doctrine is based on an officer's reasonable belief in the need to act pursuant to his or her "community caretaking functions,"[9] but its application is limited to the functions of protecting or preserving life or avoiding serious injury. *Id* at 861.[10] As part of the police officer's community caretaking functions to protect and preserve

life and prevent substantial injury, an officer may enter and search a private residence without a warrant for the limited purpose of serving those functions, when it is objectively reasonable. *Id.* at 864.

For example, the emergency doctrine has been construed to justify entry into a residence to try and locate a person who has been reported as missing. *Brimage,* 918 S.W.2d at 501. (citations omitted); *see also Bass v. State,* 732 S.W.2d 632, 635 (Tex.Crim.App.1987) (when concerned relatives reported appellant missing and invited detective into appellant's home to establish whether appellant's body was inside or appellant had been victim of foul play, the detective's search for appellant's body or signs of foul play was permissible).[11] Moreover, the Court of Criminal

---

**8.** In *Bailey,* officers were dispatched to a house to respond to an alleged stabbing. No one in the house responded when the officers repeatedly knocked on the door, but the officers noticed Bailey in the window on the second floor. *Id.* The officers called the telephone of the house, but no one answered. *Id.* The officers also called the person who reported the stabbing, but were unable to reach him at that time. *Id.* The officer at the scene stated that, because he had received a report of a possible stabbing at the residence and Bailey refused to open the door, he feared the stabbing victim may be inside the house and may need medical attention. *Id.* The officers entered the house and searched for the stabbing victim. *Id.* Instead, officers found Bailey in an upstairs bedroom, and, in plain view in that bedroom, the officers found a controlled substance. *Id.*

Notably, at the time the officer entered and searched the house, he had not received any additional information that would indicate a stabbing had not occurred, or that the victim would not be found in the house, or that the victim would not be in need of immediate medical treatment. *Id.* Although the officer took the time to call the residence and the person who reported the stabbing, he had no indication at the time of the search that the emergency situation had terminated. *Id.* We held that, given the information available to the officer at the time he decided to search

the house, it was objectively reasonable for him to believe there may be a seriously injured person in need of help inside the house. *Id.* at *3 (citing *Rangel v. State,* 972 S.W.2d 827, 831 (Tex.App.-Corpus Christi 1998, pet. ref'd) (holding even though no signs of violence at house, officer's belief injured gang member may be in house was reasonable after officer received bulletin that drive-by shooting occurred at opposing gang's hangout)).

**9.** "Community caretaking functions" include, among others, the duty to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, and resolve conflict. *Laney,* 117 S.W.3d at 860 (citations omitted).

**10.** In *Laney,* the court distinguishes the emergency doctrine from the exigent circumstances doctrine, which applies when the police are acting in their "crime-fighting" role (i.e. the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute). *Laney,* 117 S.W.3d at 861.

**11.** In *Bass,* the defendant—a suspect in the murder of his girlfriend—was reported missing by his relatives, concerned that he, too,

Appeals has held that an officer may enter a home without warrant or consent when the officer can reasonably believe that concern over an occupant is genuine, and the likelihood of an injury is founded. *Janicek*, 634 S.W.2d at 691.

To illustrate, we discuss *Celani v. State*, 940 S.W.2d 327 (Tex.App.-San Antonio 1997, pet. ref'd). In *Celani*, a concerned cousin asked police to come to the home in which Celani and his mother lived, because she had not seen nor heard from either Celani or his mother in several days, and was worried about the mother, Mrs. Celani. *Id.* Mrs. Celani's cousin and two of Mrs. Celani's neighbors met police at the home and explained that they had tried knocking on the door and leaving notes for her, all without response. *Id.* They further explained that this was very unusual behavior for Mrs. Celani. *Id.* They also told officers that Celani was mentally ill and had been in and out of mental institutions. *Id.*

After speaking with the women, the officers knocked on Celani's front and side doors, but there was no response. *Id.* They then walked around the house, trying

all the doors and windows, eventually finding the back door closed, but unlocked. *Id.* Because Mrs. Celani's cousin and neighbors seemed extremely concerned for her welfare, the officers entered the house. *Id.* Once inside, they found Mrs. Celani lying dead in the hallway, her head and upper torso covered in aluminum foil. *Id.* During a systematic search for a suspect or another body, the officers saw that the walls were covered in blood, and found bloody men's clothing. *Id.* Finding neither a suspect, nor another body, the officers called it in. *Id.*

The court concluded that the record supported a finding the officers could have reasonably believed Mrs. Celani's cousin's and neighbors' concern for her welfare was genuine and that there was a likelihood of an injury. *Id.* Accordingly, the court held that the trial court did not abuse its discretion, because it could reasonably have found that the officer's entry into the Celani home was justified by her cousin's and neighbors' extreme concern over her welfare. *Id.* As in *Janicek*, the court stated, what the officers ultimately did is inherent

might have been murdered. 732 S.W.2d at 634. The investigating detective [Donovan] testified that he was invited into Bass's house by his relatives (who were not aware that Bass was a murder suspect) specifically to establish whether Bass's body was inside or Bass had been the victim of foul play. *Id.* The detective accompanied Bass's relatives into the house and discovered that he was not home. *Id.* The detective suggested that they look for clues to where he might be, and then proceeded to search a chest of drawers, in which he found a box of bullets that later proved to be evidence in the murder. *Id.* The detective asked Bass's sister, whom he knew to have no interest in the house, for permission to take the bullets, and she agreed. *Id.*

The court noted that other than the detective's testimony that Bass's relatives expressed concern that he might be dead in the house or have been dragged from it, no other emergency or exigent circumstances existed,

"except Detective Donovan's desire to seek clues as to appellant's whereabouts." *Id.* at 635. The court found that, by exceeding the permissible scope of a search for Bass's body or signs of foul play, the detective rendered an initially good search bad. *Id.* Any reasonable concern that Bass's house might have been the scene of his own murder, the court continued, was quickly dispelled by the detective and Bass's relatives when their search for his body or signs of foul play yielded nothing. *Id.* The court concluded that when the detective, knowing Bass to be a suspect in his girlfriend's murder, satisfied himself that appellant had not been murdered at or dragged from his house, any circumstance requiring his quick, warrantless response at that residence was vitiated. *Id.* Accordingly, the court held that the trial court erred in admitting the detective's testimony that he searched the chest of drawers and found the bullets inside. *Id.*

in the very nature of their duties. *Id.* (citing *Janicek*, 634 S.W.2d at 691).

■ We use an objective standard of reasonableness to determine whether a warrantless entry into appellant's apartment was justified, taking into account the information available to Becker at the time. *See Brimage*, 918 S.W.2d at 501. In this case, Becker responded to a "check on welfare" call after Rivera contacted police to report her concerns, including that a foul odor was emanating from appellant's apartment, that she had been told by a former police officer that it smelled like a dead body, that the locks had been changed, and that apartment personnel had been unable to get into appellant's apartment. Upon arriving at the scene, Becker smelled a foul odor coming from appellant's apartment. Other residents complained to Becker about the smell, and, expressed concerns regarding the well-being of appellant and his wife. Apartment management told Becker that the residents of appellant's apartment had been heard arguing, and that since that time, only appellant had been seen, not his wife. Becker knocked at appellant's door and yelled loudly, with no response. Finally, Rivera urged the officers enter appellant's apartment and "make sure there's no dead bodies."

The trial court concluded that Becker's initial entry into appellant's apartment was pursuant to a call for service that reasonably created a belief that an emergency existed. The trial court also concluded that, based on the totality of the circumstances, Becker's observations and recognition of the marihuana did not constitute an unreasonable search. We agree. Given the information available to Becker, it was objectively reasonable for him to believe that a person within appellant's apartment was in need of immediate aid. *See Brimage*, 918 S.W.2d at 501; *see also Janicek*, 634 S.W.2d at 691 (reasonableness of the emergency entry is to be judged by the circumstances as they existed at the time the decision was made to enter rather than being affected by whatever condition is found inside.)

Appellant correctly points out that Becker could not identify the foul odor emanating from appellant's apartment. Neither could Rivera, although she testified that a former police officer told her it smelled like a dead body. Alternatively, appellant argues that, even if Becker had claimed that he detected the odor of a decaying body, there would still not have been a reasonable basis to believe that an emergency existed.[12] We disagree. On these facts, the foul odor emanating from appellant's apartment was not the only reason for genuine concern regarding the welfare of appellant's wife. As discussed above, Becker was also aware that other resi-

---

**12.** Although not binding on this court, appellant cites *Condon v. People*, 176 Colo. 212, 489 P.2d 1297 (1971) for the proposition that the odor of a decomposing body does not constitute an emergency. *Id.* at 1300. In *Condon*, the Colorado court stated, "We are of the opinion that the odor of a decomposing body, however unpleasant and discomforting, does not give rise to an emergency *in and of itself* sufficient to allow a [warrantless entry] for there would be no hope of revival." *Id.* (Emphasis added). This case is clearly distinguishable, because, in addition to the foul odor emanating from the apartment, the po-

lice understood other residents had heard appellant and his wife arguing, and his wife had not been seen since that time. *See also State v. Scott*, 343 N.C. 313, 471 S.E.2d 605, 614–15 (1996) (where police sent to house on missing persons report noticed green flies and smell of rotting flesh emanating from under the house, the court found emergency search of crawl space "reasonable under the circumstances." Notably, the officer testified that in another missing person's case, he had smelled decaying flesh and had found the person alive, and that "the subject's feet were rotting.") *Id.*

dents had heard appellant and his wife arguing, and his wife had not been seen since that time.

 Moreover, the report of a homicide or the existence of circumstances in which an unnatural death could have occurred can constitute an emergency. *Corbett v. State,*[13] 493 S.W.2d 940, 946–47 (Tex.Crim.App.1973). In *Colburn v. State,* for example, an officer received a call to perform a "welfare check" on a reported homicide. 966 S.W.2d 511, 519 (Tex.Crim. App.1998). The officer was informed that Colburn claimed he had just killed a girl in his apartment and had requested his neighbor call the police. *Id.* Colburn also told the neighbor the girl was still in the apartment. *Id.* The court reasoned that, although there was reason to believe that the victim was already dead, a reasonable officer under the circumstances might have thought there was a possibility that the victim might still be alive, but seriously injured. *Id.* Thus, the court held that the officer's immediate, warrantless search of the apartment was justified under the emergency doctrine. *Id.* Likewise, in this case, even if he believed the foul odor to be that of a decomposing body, under the circumstances, Becker could have reasonably believed that appellant's wife might

still be alive, but in need of immediate emergency aid. *See Bray,* 597 S.W.2d at 765 (adjudging that "[o]fficers may enter a building where a 'body' has been reported, for the report of death may be inaccurate and it may be possible to revive the body.") (citing *Corbett,* 493 S.W.2d at 946)).[14]

We overrule appellant's first and second points of error.

### 3. The Warrantless Entry Into Appellant's Residence Was Valid Under The Reasonableness Requirement of Article I, Section 9 of the Texas Constitution.

 In point of error three, appellant argues that the trial court erred when it denied his motion to suppress, because, appellant contends, an unidentifiable foul odor emanating from appellant's apartment did not justify warrantless entry under an exception under Article I, Section 9 of the Texas Constitution.[15] Although appellant argues the state constitutional ground as a separate point of error, he makes no separate argument to that effect. Absent any argument or authority that Article I, Section 9 provides more protection than the Fourth Amendment or any reason why we should interpret our consti-

---

13. In *Corbett,* the police attempted to corroborate the story of a homicide by telephoning the victim and, only after receiving no answer and driving around the house to see if anything was amiss, did the officers enter the house. *Id.* Once inside, the police discovered the victim's body and then departed. *Id.* The court found that the police were reasonable in investigating the reported homicide, and that no error was committed in allowing testimony about the discovery of the victim upon the first search of the house. *Id.*

14. "[A] search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person. Frequently, the report of a death proves inaccurate and a spark of life remains, sufficient

to respond to emergency police aid." *Corbett,* 493 S.W.2d at 946 (citations omitted.).

15. Article I, Section 9 of the Texas Constitution contains no requirement that a seizure or search be authorized by a warrant, and a seizure or search that is otherwise reasonable will not be found to be in violation of that section because it was not authorized by a warrant. *Hulit v. State,* 982 S.W.2d 431, 436–38 (Tex.Crim.App.1998) (determining that police officers' actions did not violate Article I, Section 9 by asking whether, from the totality of the circumstances, after considering the public and private interests that are at stake, their action was an unreasonable seizure).

tution differently from the federal constitution, we may dispose of his points of error by addressing only the federal constitutional grounds. *See Brimage,* 918 S.W.2d at 510 fn. 11 (citing *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App. 1992) ("We decline to pursue appellant's Texas Constitutional arguments for him.")).

We overrule appellant's third point of error.

## CONCLUSION

We affirm the trial court's judgment.