02-11-252-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00252-CR


 
 
 Alfonso Contreras, Jr.
 
 
  
 
 
 APPELLANT
 
 
 
 
 V.
 
 
 
 
 The
 State of Texas
 
 
  
 
 
 STATE
 
 


----------

FROM Criminal
District Court No. 4 OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Introduction

Appellant
Alfonso Contreras, Jr. appeals his conviction for capital murder after a jury
found him guilty of killing his two-month-old child.  We affirm.




Factual and Procedural Background

Appellant
and Ashley Massey had a child named Elena.  One Sunday when Elena was two-months’
old, Ashley left her with Appellant to go to work.  When Ashley returned home she
called 911.  Emergency personnel arrived at the trailer to find Elena limp, not
breathing, and without a pulse.  Appellant told a police officer who had
responded to the call that Elena had had a cold the week before and that he and
Ashley had woken up to find that Elena had stopped breathing.

Paramedics
rushed Elena to the hospital.  Despite the heat––August in North Texas––when Elena
arrived at the emergency room her body temperature was seventy-eight degrees
Fahrenheit.

She was
seriously injured.  Her bottom was bruised, her brain had hemorrhaged, and her
major internal organs had been damaged by insufficient blood flow.  She also had
several diastatic skull fractures, meaning that at the sutures––the places
where the bones of her skull would normally connect––the bones had separated.  Some
of the skull fractures also ran across suture lines.  The damage was irreparable. 
Elena was taken off life support and died shortly thereafter.

Appellant
told a child-protective-services (CPS) investigator at the hospital that a week
to two weeks before, he had slipped while holding Elena and that she had hit
her head on a toy when he fell.  He also said that Elena’s two-year old sister
had dropped a spice rack on Elena’s head.  He reported that Elena had made
gurgling noises the previous Friday and that her eyes would not track his
finger.  He also explained that he had squeezed her, patted her on the back,
and hit her bottom.  She seemed to improve, he thought, until Sunday night when
she had trouble breathing.  He reported that he had pushed her on her chest and
raised her arms over her head to help her breathe.

Appellant
told detectives the same thing he told CPS but added that Elena had fallen off
the couch a few days before.  He also said that he had pushed on her chest
while performing CPR while the ambulance was on the way.  He could not explain,
however, how Elena’s skull had become fractured in multiple places.

The
next time Appellant was interviewed by detectives, he added that he had shaken
her in her crib on Sunday because she had been unresponsive and that as he
shook her, her head had struck the side of the crib.  He demonstrated how he
had shaken her by using a doll.

Doctors
later testified at Appellant’s trial that only great force could have caused
the injuries––not falling off a couch or hitting her head while shaken in the
way Appellant had shown.  They explained that Elena would have been unconscious
immediately after she was injured and that her need for medical attention would
have been immediately apparent.

After
the police had begun to suspect that Elena’s injuries had not been caused accidentally,
they obtained Appellant’s and Ashley’s cell phones.  They asked Ashley for hers
at the hospital and she handed it to them.  They seized Appellant’s when they
executed a search warrant at his and Ashley’s trailer.  Police obtained another
warrant to search the contents of both phones.  The investigator who obtained
the warrant mistakenly stated in his affidavit that both phones had been seized
during the search of the trailer.  He explained at trial that he had read the
thirty-four page police report and had met with the detectives who had been present
when the phones were seized before he wrote the affidavit.  He further explained
that he thought the detectives had told him that both phones had been seized at
the trailer but that the report stated that Ashley had turned hers over at the
hospital.  He testified that he discussed the discrepancy with the detectives,
and based on what they told him, he believed that both phones had been found at
the residence and that he so stated in his search warrant affidavit.

Appellant
was charged with capital murder.  He subpoenaed Ashley, who had been charged
separately in Elena’s death.  She testified outside the jury’s presence that if
he asked her anything about the case during trial she would invoke the Fifth
Amendment.

The jury
found Appellant guilty, and the State did not seek the death penalty.  The
trial court sentenced Appellant to life.  He now brings three points on appeal.

Text
Messages

In
his first two points, Appellant contends that the trial court erred by admitting
text messages he had sent to Ashley on Sunday and that the police found after
Ashley had given them her cell phone.

The
record shows that at the hospital officers asked Ashley for her cell phone and
she handed it to them.  After obtaining a warrant to search the phone, the
officers discovered that Ashley and Appellant had exchanged text messages while
Ashley was at work and Appellant was watching Elena.  The trial court
suppressed the messages Ashley sent to Appellant, but admitted over Appellant’s
objection a transcript showing the following messages he sent to her and the
times they were sent:

12:03 PM     Ok

 

1:41 PM       4 oz
already

 

1:50 PM       A
little yea she awake more

 

1:51 PM       She has
had two poopie diapers so far

 

1:55 PM       I
changed one yesterday too

 

2:08 PM       Lol
maybe

 

5:31 PM       Dude…stay
the night there for all i care

 

8:04 PM       What if
all this is my fault

 

8:06 PM       (1/2) Wats
happening to Elena wat if its all because i 

                   dropped
her cuz i it did all start after that iv been crying 

                   most
of the day thinking about this what if 

 

8:06 PM       (2/2)
its all my fault maybe she fell to hard maybe i 

                   made
her a little slow what if i left her concussed

 

8:06 PM       I
really need you

 

8:11 PM       Baby im
so scared cuz she out cold again she been fine 

                   all
day now she like knocked out whats gonna happen 

                   if
it my fault baby

 

8:14 PM       I don’t
think iv ever needed you more than now I just 

                   cant
stop crying

 

8:16 PM       Omg wat
if see bruises and think im beating her and 

                   she
acting strange i don’t want her taken away baby

          

8:18 PM       I know i
know i know i know im just f[––]ing freaking out 

                   baby
I don’t know what to do i don’t im so useless all 

                   this
cuz im a bad dad

 

8:19 PM       Her
heart beat is faint but constant she’s like knocked 

                   out

 

8:20 PM       Don’t tell
them you did it i don’t want you getting in 

                   trouble
if they do accuse

          

8:23 PM       im just
so scared i know how bad it looks well it does to 

                   me

 

8:37 PM       I
understand if you think im hurting her i promise you im 

                   not
tho but i can see if why if you do

          

8:42 PM       Do you
mean it i need the truth im telling you the truth

 

8:45 PM       Ok baby
thank you thank you

 

9:39 PM       Your
son close to getting out but its gonna feel like 

                   forever

 

9:41 PM       I know

 

9:43 PM       Its ok

 

9:45 PM       I know
but you cant

 

9:47 PM       Yes

 

In
his first point, Appellant claims that the messages were illegally obtained
because the search warrant affidavit attached to the warrant for the phone incorrectly
stated where the phone was found and which officer actually seized it.  Citing
code of criminal procedure articles 18.04(2) and 38.23, Texas constitution, article
1, section 9, and the Fourth Amendment to the United States Constitution, Appellant
essentially argues that because the warrant for Ashley’s phone contained
errors, it was invalid; and without a valid warrant, the seizure of the phone
was unreasonable under the Fourth Amendment.[2]

As
the State correctly points out, however, Appellant has no standing to complain that
the seizure of Ashley’s cell phone––which, the record shows, she voluntarily relinquished
to law enforcement––violated Appellant’s constitutional rights.  Proof of a
“reasonable expectation of privacy” is at the forefront of all Fourth Amendment
claims.  Kothe v. State, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004).  Any
defendant seeking to suppress evidence obtained in violation of the Fourth
Amendment must first show that he personally had a reasonable expectation of
privacy that the government violated.  Id.; see Rakas v. Illinois,
439 U.S. 128, 139, 99 S. Ct. 421, 428 (1978) (noting that the issue of standing
involves two inquiries:  first, whether defendant has alleged an “injury in
fact”; second, “whether the proponent is asserting his own legal rights and
interests rather than basing his claim for relief upon the rights of third
parties”).  One does not have standing to complain about the invasion of
someone else’s personal rights.  Kothe, 152 S.W.3d at 59 (citing United
States v. Salvucci, 448 U.S. 83, 84–85, 100 S. Ct. 2547, 2549 (1980)). 
Only after a defendant has established his standing to complain may a court
consider whether he has suffered a substantive Fourth Amendment violation.  Id.;
Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

Appellant
has not shown that he personally had a reasonable expectation of privacy in
Ashley’s cell phone or the text messages recorded on it. See Villarreal,
935 S.W.2d at 138.  The record shows that officers asked Ashley for her cell
phone and that she gave it to them.  Appellant presented no evidence showing
that he had any ownership interest in the messages he sent to Ashley or that he
took any steps to keep the messages private once he sent them to her phone.  Accordingly,
we hold that Appellant has failed to meet his burden to show that he personally
had a reasonable expectation of privacy that the government violated, and we
overrule his first point.  See Kothe, 152 S.W.3d at 59.

In
Appellant’s second point, he argues that because Ashley was a co-defendant who had
invoked her right not to testify at Appellant’s trial, he did not have a chance
to cross-examine her about the circumstances under which she had given her
phone to the police and was therefore denied his constitutional right to
confront a witness against him.  The Confrontation Clause of the Sixth
Amendment provides that “[i]n all criminal prosecutions, the accused shall
enjoy the right . . . to be confronted with the witnesses against him.”  U.S.
Const. Amend. VI; see Crawford v. Washington, 541 U.S. 36, 124 S. Ct.
1354 (2004).  But the Confrontation Clause is not implicated when a criminal
defendant’s own incriminating statements are used against him.  See, e.g.,
Vasquez v. Kirkland, 572 F.3d 1029, 1037 (9th Cir. 2009) (noting that
the Fifth Amendment’s right against self incrimination and not the Sixth
Amendment’s right to confront witnesses is implicated by use of a defendant’s
own statement), cert. denied, 130 S. Ct. 1086 (2010); United States
v. Brown, 441 F.3d 1330, 1358–59 (11th Cir. 2006) (holding that admitting
defendant’s own statement did not violate Confrontation Clause because “a party
cannot seriously claim that his or her own statement should be excluded because
it was not made under oath or subject to cross-examination”), cert. denied,
549 U.S. 1182 (2007); United States v. Lafferty, 387 F. Supp. 2d 500,
511 (W.D. Pa. 2005) (“Inherent in Justice Scalia’s analysis in the Crawford
opinion was the idea that the right of confrontation exists as to accusations
of third parties implicating a criminal defendant, not a criminal defendant
implicating herself.”).  Furthermore, in the Crawford line of cases, the
Supreme Court held that the Confrontation Clause was violated by a trial
court’s admitting statements that were testimonial hearsay.  The
statements Appellant claims the trial court erroneously admitted were his own statements
recorded on Ashley’s cell phone.  By definition, a party’s own statements
offered against that party are admissions by a party-opponent––they are not hearsay. 
See Tex. R. Evid. 801(e)(2).  Because Appellant’s rights under the
Confrontation Clause were not violated by the admission of his own statements
recorded on Ashley’s cell phone, we overrule Appellant’s second point.

Jury
Argument

In
his third point, Appellant contends that the trial court erred by denying his
motion for mistrial after sustaining one objection and instructing the jury to
disregard and by overruling a second objection to remarks the prosecutor made
during her closing argument.  Appellant claims that by using the words, “I
find” and “I hope,” as set out below, the prosecutor improperly and harmfully “interjected
her personal feelings in the final arguments” and that her interjection caused
Appellant harm.

          MS FERGUSON
[for the State]:  I’m not even going to waste your time talking about the page
[in the jury charge] on manslaughter and talking about how this might be a
reckless act because I find that insulting.

 

          MR. RAY
[for Appellant]:  Excuse me.  I object to what she finds.

 

          THE COURT: 
Sustained.

 

          MR. RAY: 
Ask the jury to be instructed to disregard that.

 

          THE COURT: 
Jury will disregard.

 

          MR. RAY:  It’s
the second time she’s done it.  I didn’t object the first time.  I would
respectfully ask for a mistrial.

 

          THE COURT: 
Overruled.

 

          MR. RAY: 
Thank you.

 

          MS
FERGUSON:  This is capital murder and nothing else.  Capital murder is the only
proper verdict in this case, because he knowingly did these acts by doing what
he did.  By slamming her against whatever he slammed her against, anyone would
know as a mother, as a parent, anyone would know that you can’t do that and not
harm your child.  You can’t do that and not kill your child.

 

          Elena
Contreras was two months old when she died.  She didn’t have a chance against
this Defendant; her father.  And I hope that by seeing fractures––

 

          MR. RAY: 
Excuse me.  She’s interjecting her personal feelings, a third time.

 

          THE COURT: 
Overruled.

 

          MR. RAY: 
Thank you.

 

          MS.
FERGUSON:  The fractures, everything you’ve heard from all the witnesses, all
of the doctors, the autopsy reports, the CPS workers, they all believe this is
capital murder.

 

The
first remark that Appellant contends was an improper interjection of the
prosecutor’s personal feelings into the argument is “I find that insulting.” 
The trial court sustained Appellant’s objection, instructed the jury to
disregard but denied Appellant’s request for mistrial.  The issue, therefore,
is whether the trial court erred by denying a mistrial.  Even if we were to
assume the prosecutor’s remark was improper, we cannot conclude that it was within
that class of highly prejudicial and incurable errors that warrants the extreme
remedy of a mistrial.  See Ocon v. State, 284 S.W.3d 880, 884 (Tex.
Crim. App. 2009) (“A mistrial is an appropriate remedy in ‘extreme
circumstances’ for a narrow class of highly prejudicial and incurable
errors.”).  This is especially true in view of the trial court’s prompt
instruction to disregard, which in the absence of evidence to the contrary, we
presume the jury followed.  See Gardner v. State, 730 S.W.2d 675, 696
(Tex. Crim. App.), cert. denied, 484 U.S. 905 (1987).  We overrule
Appellant’s third point as it relates to the first complained-of remark.

As
far as the second remark, Appellant’s objection swiftly cut it off before it
was completed, so we cannot tell what it was going to be.  All the prosecutor
got out before Appellant rose to object was “I hope that by seeing fractures––”. 
While we can assume the prosecutor was not going to say “I hope by seeing
fractures you will vote not guilty,” the point is that it is difficult to
determine error, much less one that is harmful, from an incomplete remark.  But
even if we assume that the prosecutor intended to say that she hoped by seeing
the fractures the jury would find Appellant guilty of capital murder, that would
hardly have been news to anyone in the courtroom.  It is not lost upon juries
that prosecutors hope for a guilty verdict or that defendants and their counsel
hope for an acquittal.  Even if prosecutors are not supposed to inject their
personal feelings into a case, we cannot hold in this case that the prosecutor’s
expressing to the jury her hope that it would find the evidence of fractures
probative of the issue of Appellant’s guilt affected any of Appellant’s
substantial rights.  See Tex. R. App. P. 44.2(b); Martinez v. State,
17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); Mosley v. State, 983
S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), cert. denied, 526
U.S. 1070, 119 S. Ct. 1466 (1999).  This point is overruled.

 

 

Conclusion

Having
overruled all of Appellant’s points, we affirm the judgment of the trial court.

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
WALKER, 
MCCOY, and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  August 30, 2012








 









[1]See Tex. R. App. P. 47.4.





[2]Appellant does not argue
that the Texas constitution affords any greater protection than the United
States Constitution, so we treat his claim as resting on the latter. See
Brimage v. State, 918 S.W.2d 466, 477 n.11 (Tex. Crim. App. 1994), cert.
denied, 519 U.S. 838 (1996); Rauscher v. State, 129 S.W.3d 714,
723–24 (Tex. App.––Houston [1st Dist.] 2004, pet. ref’d); Hulit v. State,
947 S.W.2d 707, 709 n.3 (Tex. App.––Fort Worth 1997), aff’d, 982 S.W.2d
431 (Tex. Crim. App. 1998).