**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL VASQUEZ,
           *Petitioner-Appellant,*

v.

R. J. KIRKLAND, Warden,
           *Respondent-Appellee.*

No. 08-55699

D.C. No.
2:05-cv-00589-AG-
JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
May 4, 2009—Pasadena, California

Filed July 20, 2009

Before: Betty B. Fletcher, Raymond C. Fisher and
Ronald M. Gould, Circuit Judges.

Opinion by Judge B. Fletcher

## COUNSEL

Michael Tanaka, Deputy Federal Public Defender (argued) and Sean K. Kennedy, Federal Public Defender, Los Angeles, California, for the petitioner-appellant.

David F. Glassman, Deputy Attorney General (argued), Edmund G. Brown, Jr., Dane R. Gillette, Pamela Hamanaka, and Steven D. Matthews, Office of the California Attorney General, Los Angeles, California, for the respondent-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

Daniel Vasquez, a California prisoner, appeals the district court's denial of his petition for a writ of habeas corpus. Vasquez was convicted in California state court of the first-degree murder of Frank Hernandez. He alleges that he was denied his Sixth Amendment rights under the Confrontation Clause because he was unable effectively to cross-examine the prosecution's key witness, Carmen Zapata. Zapata, the victim's mother, is deaf, cannot speak, and has never learned a standard sign language. Rather, she communicates by using a combination of signs, gestures, facial expressions, and lip reading. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We affirm the denial of Vasquez's petition

because the California Court of Appeal's decision to affirm Vasquez's conviction was neither contrary to nor an objectively unreasonable application of clearly established federal law.

## I.

On the afternoon of August 3, 2001, Frank Hernandez, a member of the Eastlake gang, was at home with his mother Carmen Zapata, who is deaf, and his girlfriend Shirley Sanchez.[1] Hernandez and his mother were in the living room of their apartment, and Sanchez was in a bedroom.

Zapata felt a "boom" from a gunshot, then saw Hernandez fall to the floor. Looking up, she saw a young man standing in the doorway holding a gun. The man fired a second shot at Hernandez. Zapata grabbed the shooter's hand and tried to close the door, but the shooter put his foot in the doorway to prevent her from doing so. Zapata was face-to-face with the shooter during this struggle.

After Sanchez heard the first shot, she entered the living room, where she saw "some guy" shooting while Zapata tried to protect her son. Sanchez helped Zapata force the door closed, shutting the shooter out of the apartment. Zapata waited a few minutes and then went to a neighbor for help calling the police. The police received the 911 call at 1:25 p.m. When they arrived, they found Hernandez dead of gunshot wounds to the chest and abdomen.

At the police station, Zapata was interviewed by Detective

---

[1] We rely on the state appellate court's decision for our summary of the facts of the crime. Because this initial statement of facts is drawn from the state appellate court's decision, it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009). Vasquez does not allege that these preliminary facts are erroneous.

Lisa Sanchez.[2] Detective Sanchez was assisted by a records clerk who had learned American Sign Language from her stepmother and by taking classes. Detective Sanchez showed Zapata a "gang book," which was a book of 160 photographs of people whom the police believed belonged to the Clover gang. Zapata "right away" identified a photograph of Vasquez. Detective Sanchez testified that Zapata "became like excited and scared and pointing and making noises with her mouth and gesturing that he was the shooter." After selecting the photograph of Vasquez, Zapata wrote out the following statement: "The person in photo no. 5 is the person that shot my son today."

The police separately interviewed Shirley Sanchez. When she reviewed the gang book, Sanchez selected photographs of two men, one of whom was Vasquez. She described the shooter as a light-skinned Hispanic male, 20 to 22 years old, 5′9″ to 5′10″ tall, with a shaved head. Sanchez told the police that she had seen the shooter about five times before the shooting and identified him as a member of the Clover gang, a rival to the Eastlake gang to which Hernandez belonged. She said that the shooter had driven by the apartment, holding a gun, about three weeks earlier. She said that she heard the man tell Hernandez, "You can't be living here. Your homeboys killed mine not long ago, so you had better move out. I am not playing no games."

Shortly thereafter, Vasquez was arrested and charged with Hernandez's murder.

Vasquez's trial took about nine days. Zapata was the prosecution's key witness. Although Zapata is deaf and does not speak, she has never learned a standard form of sign language. She also has a very limited ability to read and write. She communicates with others using a combination of signs, gestures,

---

[2] We refer to Shirley Sanchez as either "Sanchez" or "Shirley Sanchez" and to Detective Lisa Sanchez as "Detective Sanchez."

facial expressions, and sounds. At trial, Zapata testified with the assistance of a court-certified American Sign Language interpreter and a certified intermediary interpreter. The intermediary interpreter, like Zapata, is deaf and cannot speak. When counsel asked Zapata a question, the American Sign Language interpreter translated the question into sign language for the intermediary interpreter, who then used signs, gestures, and facial expressions to communicate the question to Zapata. Zapata gave her answer to the intermediary interpreter, who then translated Zapata's answer into American Sign Language. Finally, the American Sign Language interpreter announced Zapata's answer to the court.

In addition to using the intermediary interpreter, the parties facilitated Zapata's testimony by pointing to photographs and diagrams, using picture dictionaries to help identify colors, asking Zapata to act out what happened at the apartment, and occasionally asking the interpreters to offer a narrative account of Zapata's testimony rather than interpret her testimony directly.

Even with this arsenal of techniques, the attorneys and the interpreters found it difficult to communicate questions to Zapata and to interpret her answers. The American Sign Language interpreter and the intermediary interpreter paused to confer with one another more than forty times during Zapata's testimony regarding the best way to interpret Zapata's statements for the jury. The court, the interpreters, and the attorneys also conferred outside of the presence of the jury on several occasions to determine how best to facilitate Zapata's testimony. During Zapata's second day of testimony, after several of these conferences had occurred, defense counsel delivered a stipulated description of the method of interpretation to the jury.[3] After defense counsel addressed the jury, the trial judge added,

---

[3]In relevant part, the stipulation was read to the jury as follows:

> Now, we will proceed and will take whatever time
> it takes and make whatever accommodation is
> needed to ensure that all witnesses, regardless of
> which party calls them, that all witnesses have an
> ability to relate their testimony, and you will be the
> ones at the end of the day to evaluate the credibility
> of these witnesses.

Defense counsel repeatedly objected during both direct examination and cross-examination, arguing that he was disadvantaged because he could not tell whether Zapata was "understanding what's being interpreted to her because we have no independent way of discerning what her state of mind is when the question is posed to her." Defense counsel was particularly concerned about his ability to examine Zapata about colors, about the timing and the sequence of events, and about

---

[T]he court has seen fit to utilize the services of two different interpreters for each occasion when Ms. Zapata is either questioned or gives an answer . . . .

Ms. Gonzales[ ] is known as an intermediary interpreter. Her skills are developed because she also does not speak and is hearing impaired.

Accordingly, the intermediary interpreter has some similar experiences as would a witness that does not speak and does not hear.

[T]he . . . intermediary interpreter will then utilize the services of the American Sign Language interpreter . . . .

So when a question is posed from counsel, it first goes to the American Sign Language interpreter. . . . She will then translate it in sign language for Ms. Gonzales. Ms. Gonzales will then use a form or a mixture of both known sign language expression, gesture, and facial expression and body language to communicate the essence of the question to the witness.

The witness in turn will respond to Ms. Gonzales and then to the American Sign Language interpreter, [who] will announce the testimony to the court.

inconsistencies between her prior statements and her testimony at trial. The trial court overruled Vasquez's objections. The trial court noted that Zapata's answers were responsive to the questions and consistent with other evidence; that the defense was at no more disadvantage than the prosecution and that in fact, the difficulties would more likely favor the defense because the prosecution bore the burden of proof beyond a reasonable doubt; and that there was no basis to challenge the effectiveness of the interpreters. Stating that it would give Vasquez "vast leeway," the trial court placed no limitations on the scope of Vasquez's cross-examination of Zapata.

Zapata's testimony was critical to the prosecution because Shirley Sanchez, the only other witness to Hernandez's shooting, claimed at trial that she could not remember identifying Vasquez or making any statements because she was high on methamphetamine at the time of the murder. Detective Sanchez testified regarding the statements and identifications made by Shirley Sanchez; the jury also saw a videotape of Shirley Sanchez's statement to the police.

The prosecution also introduced evidence of the "bad blood" between Vasquez's Clover gang and Hernandez's Eastlake gang, as well as evidence of a time sequence that made it possible for Vasquez to have been at the scene of the murder: Vasquez had picked up a pair of eyeglasses at Sears Optical at 1:12 p.m. on the day of the shooting, just thirteen minutes before the neighbor called 911 at 1:25 p.m; the Sears store was about 3.8 miles from Hernandez's apartment, about an eight-minute drive; and Vasquez entered a Vons market about two and a half blocks from Hernandez's apartment at 1:37 p.m.

Vasquez presented an alibi defense, arguing that he drove straight to Vons after picking up the eyeglasses. Defense counsel introduced a videotape made a year after the murder showing a drive between Sears and Vons at 1:00 p.m. that

took thirty minutes, in contrast to the eight-minute drive shown in the prosecution's videotape.

The jury returned a verdict convicting Vasquez of first-degree murder. The trial court sentenced Vasquez to sixty years in prison.

On appeal, Vasquez argued that he was denied his right to due process and to confront and cross-examine witnesses because of Zapata's limited ability to comprehend questions and to communicate responses. The California Court of Appeal rejected Vasquez's argument in an unpublished opinion. The Court of Appeal cited no federal cases, but adopted the reasoning of *People v. Tran*, 47 Cal. App. 4th 759 (1996), which it found to be "substantively indistinguishable" from Vasquez's case, and held that Vasquez was not deprived of his right to confront and cross-examine Zapata. In *Tran*, Ahn, a victim of a shooting, was left a quadriplegic and was unable to speak as a result of his injuries. *Id.* at 765. When Ahn testified at Tran's trial, the court explained Ahn's condition to the jury and said that he would tap once for "yes" and twice for "no." *Id.* at 766. On appeal, Tran claimed that he was deprived of his right of confrontation because Ahn's "physical and mental limitations precluded him from conducting a meaningful cross-examination." *Id.* at 769. The Court of Appeal disagreed, finding that the limitations on Tran's ability to cross-examine Ahn "were not placed there by the court, but arose from Ahn's physical condition." *Id.* at 770. The court found that any limits on Ahn's ability to testify affected both the prosecution and the defense, and that although the attorneys were frustrated that they had to ask questions in a form that Ahn could answer by tapping "yes" or "no," the trial court did not restrict counsel's ability to cross-examine the witness. *Id.* The *Tran* court held that there was no violation of the defendant's confrontation rights because although "[t]he confrontation clause guarantees the opportunity to confront and cross-examine, [ ] this does not mean that a defen-

dant has a constitutional right to ask a particular form of question." *Id.*

The California Supreme Court denied Vasquez's petition for review without opinion.

After Vasquez filed his petition for a writ of habeas corpus in federal court, the magistrate judge issued a Report and Recommendation, recommending that the district court grant habeas relief on the ground that Vasquez's Confrontation Clause rights were violated by the lack of effective cross-examination. The district court, however, declined to accept the magistrate judge's recommendation and entered an order denying Vasquez's habeas petition.

The district court issued a certificate of appealability. Vasquez timely appealed.

## II.

We review de novo a district court's decision to deny a petition for a writ of habeas corpus. *Campbell v. Rice*, 408 F.3d 1166, 1169 (9th Cir. 2005) (en banc). Because Vasquez filed his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Vis-*

*ciotti*, 537 U.S. 19, 24 (2002) (per curiam). "A state court decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Lockyer*, 538 U.S. at 75 (internal citations omitted). Relief is contingent on a determination that the constitutional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation omitted).

Because the California Supreme Court denied Vasquez's petition for review without comment, we review the California Court of Appeal's opinion as the last reasoned state court opinion on the claims raised in this appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). The state court decision need not cite Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

## III.

**[1]** The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has explained that the right of confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Rather, "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* at 315-16 (internal quotation marks and

citation omitted); *accord Melendez-Dias v. Massachusetts*, ___ S. Ct. ___, 2009 WL 1789468, at *3 (June 25, 2009) ("[The Confrontation Clause] guarantees a defendant's right to confront those 'who bear testimony' against him." (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004))). The Confrontation Clause does not prevent a trial judge from imposing "reasonable limits" on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Court has held, however, that a defendant's Confrontation Clause rights were violated when he was "prohibited from engaging in otherwise appropriate cross-examination designed . . .'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " *Id.* at 680 (quoting *Davis*, 415 U.S. at 318).

Vasquez argues that he suffered a "complete failure of confrontation" because he could not cross-examine Zapata effectively. He alleges that because the interpreters had difficulty conveying questions relating to time, color, past statements, or other abstract concepts, he was effectively barred from questioning Zapata about her prior identifications and statements.[4] He contends that this placed him at a distinct disadvantage because the prosecution was able to obtain from Zapata an essentially narrative account of the events on the day of Hernandez's murder, while the defense had the more challenging task of impeaching that account with Zapata's prior statements.

[2] Vasquez is, however, unable to point us to any case in which the Supreme Court found a violation of a defendant's Confrontation Clause rights where the limitations on the effectiveness of cross-examination resulted from the witness's own physical impairments. The Supreme Court cases that Vasquez cites in his brief to support his Confrontation Clause

---

[4]Vasquez does not challenge the admission of Zapata's prior identification of Vasquez or the prior statements she gave to the police, nor does he challenge Zapata's competency to testify.

argument follow four general themes. Although the cases recognize the general principle that a defendant has a right to effective cross-examination, none involve issues or facts similar to those presented in this case.

**[3]** Vasquez's first set of cases involves the admissibility of prior statements of a witness. *See Dutton v. Evans*, 400 U.S. 74, 88 (1970) (plurality opinion) (defendant's confrontation rights not violated by the admission under state hearsay rules of a co-conspirator's out-of-court statement where the witness was under oath and subject to cross-examination before the trier of fact); *California v. Green*, 399 U.S. 149, 158 (1970) (defendant's confrontation rights not violated by admitting a declarant's out-of-court statement "as long as the declarant is testifying as a witness and subject to full and effective cross-examination"); *Pointer v. Texas*, 380 U.S. 400, 406-07 (1965) (defendant's confrontation rights violated by admitting a witness's preliminary hearing testimony where the testimony was not tested by cross-examination at the hearing and the witness did not testify at the trial). *See also Melendez-Dias*, ___ S. Ct. ___, 2009 WL 1789468, at *3 (Under the Confrontation Clause, "[a] witness's testimony against a defendant is . . . inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination."). Here, Vasquez does not challenge the admission of Zapata's prior identification or her prior statements to police. The state court's decision was therefore neither contrary to nor an unreasonable application of then-existing Supreme Court authority.

**[4]** A second set of cited cases recognizes Confrontation Clause violations where the trial court placed some procedural obstacle before the defendant's ability to cross-examine a witness. *See Van Arsdall*, 475 U.S. at 679 (defendant's confrontation rights violated when the trial court prohibited all inquiry into the possibility that the witness might be biased in favor of the prosecution as a result of the state's dismissal of his pending public drunkenness charge); *Davis*, 415 U.S. at

318 (defendant's confrontation rights violated when the trial court did not allow the defendant to cross-examine a witness about his probationary status as a juvenile offender). Again, the state court's decision is neither contrary to nor an unreasonable application of these cases. Vasquez makes no claim that the trial court placed improper limits on his ability to cross-examine Zapata. Rather, he bases his claim on the inherent difficulty of cross-examining a witness whose ability to understand questions and communicate answers is impaired.[5]

[5] A third set of cases involves challenges to procedures invoked to protect child witnesses. *See Maryland v. Craig*, 497 U.S. 836, 855-57 (1990) (defendant's confrontation rights not violated by allowing child witnesses to testify by one-way closed circuit television where the state made an adequate showing of necessity and the child witnesses testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified); *Kentucky v. Stincer*, 482 U.S. 730, 744 (1987) (exclusion of a defendant from a hearing held to determine the competency of child witnesses did not violate defendant's Confrontation Clause rights). Although an unusual two-interpreter process was used to elicit Zapata's testimony, Vasquez does not challenge this process. Thus, the state court did not unreasonably apply these cases.

---

[5]In his reply, Vasquez argues that there is no rule that Confrontation Clause violations result only from the actions of the trial court, because confrontation rights can be violated when a witness refuses to testify. He relies on *Douglas v. Alabama*, 380 U.S. 415 (1965), for this premise. In *Douglas*, the state introduced a confession purportedly made by Loyd, a separately-tried accomplice. *Id.* at 416. Loyd invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions about the confession. *Id.* The Court held that Douglas's inability to cross-examine Loyd about the alleged confession denied his Confrontation Clause rights. *Id.* at 419. Vasquez's attempt to analogize Loyd's refusal to testify to Zapata's willing testimony is misplaced. Even if *Douglas* establishes that a witness's refusal to testify can violate a defendant's confrontation rights, that is not what occurred here, and the Court of Appeal's holding is not, therefore, contrary to *Douglas*.

**[6]** A final set of cases involve the use of a defendant's own statements against him; that is, they implicate a defendant's Fifth Amendment rights rather than the Sixth Amendment right of confrontation. *See Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) (Fifth Amendment not violated by using a criminal defendant's pre-arrest silence to impeach the defendant's credibility); *Harris v. New York*, 401 U.S. 222, 226 (1971) (Fifth Amendment not violated by using a statement taken in violation of *Miranda v. Arizona* for impeachment purposes). Because Vasquez raises no Fifth Amendment claim, the state court's decision cannot be said to be contrary to or an unreasonable application of these cases.

**[7]** The Supreme Court case that presents a factual situation closest to the present case is *United States v. Owens*, 484 U.S. 554 (1987). In *Owens*, the victim's memory was severely impaired as a result of injuries he suffered when he was attacked by a prisoner. *Id.* at 556. In an interview with an FBI agent at the hospital, the victim was able to describe the attack and identify Owens as his attacker. *Id.* At trial, the victim testified that he remembered identifying Owens, but during cross-examination he admitted that he could not remember seeing the assailant, nor could he remember whether any of his many visitors had suggested that the defendant had attacked him. *Id.* Defense counsel unsuccessfully attempted to refresh the victim's recollection with hospital records. *Id.* The jury convicted Owens of assault with intent to commit murder. *Id.* The Supreme Court held that the Confrontation Clause was not "violated by admission of an identification statement of a witness who is unable, because of his memory loss, to testify concerning the basis for the identification." *Id.* at 564. The Court stated that "[t]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.' " *Id.* at 559 (quoting *Stincer*, 482 U.S. at 739) (internal quotation marks omitted). The Court also noted that "the traditional protections of the oath, cross-examination, and opportunity

for the jury to observe the witness' demeanor satisfy the constitutional requirements." *Id.* at 560 (citing *Green*, 399 U.S. at 158-61).

**[8]** Here, as in *Owens*, the trial court provided the defendant the opportunity for effective cross-examination: the trial court placed no limits on the scope or duration of cross-examination. Moreover, Zapata testified under oath and the jury was able to observe her demeanor in order to assess her credibility. We empathize with the challenges that defense counsel faced in cross-examining Zapata. Those challenges, however, do not rise to a deprivation of the *opportunity* for effective cross-examination. Defense counsel could question Zapata about the shooting and about her identification of Vasquez. The jury, having been instructed as to the nature of the intermediary interpretation process, could observe the difficulties that the interpreters encountered in communicating counsel's questions and interpreting the gestures and signs that Zapata gave in response, and weigh the value of Zapata's testimony accordingly. Thus, like the defendant in *Owens*, Vasquez had ample opportunity "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318. In fact, Vasquez's opportunity for effective cross-examination exceeded that in *Owens*, where the witness's memory impairment left no possibility that defense counsel could cross-examine the witness about the attack or his identification of the defendant. Here, by contrast, Zapata clearly remembered the shooting and her prior identification of Vasquez, but had difficulty communicating what she remembered.

**[9]** Because there is no factually analogous Supreme Court decision finding a confrontation clause violation on the basis of the witness's own physical impairments, the California Court of Appeal's decision affirming Vasquez's conviction is not contrary to a Supreme Court decision with materially indistinguishable facts. *See Lambert*, 393 F.3d at 974. In addi-

tion, because the trial court imposed no limitations that obstructed Vasquez's opportunity to effectively cross-examine Zapata, the California Court of Appeal did not unreasonably apply Supreme Court precedent. *See Lockyer*, 538 U.S. at 75; *see also Owens*, 484 U.S. at 559. We therefore affirm the district court's denial of Vasquez's petition for a writ of habeas corpus.

**AFFIRMED.**