

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00252-CR

ALFONSO CONTRERAS, JR.                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Alfonso Contreras, Jr. appeals his conviction for capital murder after a jury found him guilty of killing his two-month-old child. We affirm.

----

[1]*See* Tex. R. App. P. 47.4.

## Factual and Procedural Background

Appellant and Ashley Massey had a child named Elena. One Sunday when Elena was two-months' old, Ashley left her with Appellant to go to work. When Ashley returned home she called 911. Emergency personnel arrived at the trailer to find Elena limp, not breathing, and without a pulse. Appellant told a police officer who had responded to the call that Elena had had a cold the week before and that he and Ashley had woken up to find that Elena had stopped breathing.

Paramedics rushed Elena to the hospital. Despite the heat—August in North Texas—when Elena arrived at the emergency room her body temperature was seventy-eight degrees Fahrenheit.

She was seriously injured. Her bottom was bruised, her brain had hemorrhaged, and her major internal organs had been damaged by insufficient blood flow. She also had several diastatic skull fractures, meaning that at the sutures—the places where the bones of her skull would normally connect—the bones had separated. Some of the skull fractures also ran across suture lines. The damage was irreparable. Elena was taken off life support and died shortly thereafter.

Appellant told a child-protective-services (CPS) investigator at the hospital that a week to two weeks before, he had slipped while holding Elena and that she had hit her head on a toy when he fell. He also said that Elena's two-year old sister had dropped a spice rack on Elena's head. He reported that Elena had

2

made gurgling noises the previous Friday and that her eyes would not track his finger. He also explained that he had squeezed her, patted her on the back, and hit her bottom. She seemed to improve, he thought, until Sunday night when she had trouble breathing. He reported that he had pushed her on her chest and raised her arms over her head to help her breathe.

Appellant told detectives the same thing he told CPS but added that Elena had fallen off the couch a few days before. He also said that he had pushed on her chest while performing CPR while the ambulance was on the way. He could not explain, however, how Elena's skull had become fractured in multiple places.

The next time Appellant was interviewed by detectives, he added that he had shaken her in her crib on Sunday because she had been unresponsive and that as he shook her, her head had struck the side of the crib. He demonstrated how he had shaken her by using a doll.

Doctors later testified at Appellant's trial that only great force could have caused the injuries—not falling off a couch or hitting her head while shaken in the way Appellant had shown. They explained that Elena would have been unconscious immediately after she was injured and that her need for medical attention would have been immediately apparent.

After the police had begun to suspect that Elena's injuries had not been caused accidentally, they obtained Appellant's and Ashley's cell phones. They asked Ashley for hers at the hospital and she handed it to them. They seized Appellant's when they executed a search warrant at his and Ashley's trailer.

3

Police obtained another warrant to search the contents of both phones. The investigator who obtained the warrant mistakenly stated in his affidavit that both phones had been seized during the search of the trailer. He explained at trial that he had read the thirty-four page police report and had met with the detectives who had been present when the phones were seized before he wrote the affidavit. He further explained that he thought the detectives had told him that both phones had been seized at the trailer but that the report stated that Ashley had turned hers over at the hospital. He testified that he discussed the discrepancy with the detectives, and based on what they told him, he believed that both phones had been found at the residence and that he so stated in his search warrant affidavit.

Appellant was charged with capital murder. He subpoenaed Ashley, who had been charged separately in Elena's death. She testified outside the jury's presence that if he asked her anything about the case during trial she would invoke the Fifth Amendment.

The jury found Appellant guilty, and the State did not seek the death penalty. The trial court sentenced Appellant to life. He now brings three points on appeal.

### Text Messages

In his first two points, Appellant contends that the trial court erred by admitting text messages he had sent to Ashley on Sunday and that the police found after Ashley had given them her cell phone.

4

The record shows that at the hospital officers asked Ashley for her cell phone and she handed it to them. After obtaining a warrant to search the phone, the officers discovered that Ashley and Appellant had exchanged text messages while Ashley was at work and Appellant was watching Elena. The trial court suppressed the messages Ashley sent to Appellant, but admitted over Appellant's objection a transcript showing the following messages he sent to her and the times they were sent:

| | |
|---|---|
| 12:03 PM | Ok |
| 1:41 PM | 4 oz already |
| 1:50 PM | A little yea she awake more |
| 1:51 PM | She has had two poopie diapers so far |
| 1:55 PM | I changed one yesterday too |
| 2:08 PM | Lol maybe |
| 5:31 PM | Dude…stay the night there for all i care |
| 8:04 PM | What if all this is my fault |
| 8:06 PM | (1/2) Wats happening to Elena wat if its all because i dropped her cuz i it did all start after that iv been crying most of the day thinking  about this what if |
| 8:06 PM | (2/2) its all my fault maybe she fell to hard maybe i made her a little slow what if i left her concussed |
| 8:06 PM | I really need you |
| 8:11 PM | Baby im so scared cuz she out cold again she been fine all day now  she like knocked out whats gonna happen if it my fault baby |

| | |
|---|---|
| 8:14 PM | I don't think iv ever needed you more than now I just cant stop crying |
| 8:16 PM | Omg wat if see bruises and think im beating her and she acting strange i don't want her taken away baby |
| 8:18 PM | I know i know i know i know im just f[—]ing freaking out baby I don't know what to do i don't im so useless all this cuz im a bad dad |
| 8:19 PM | Her heart beat is faint but constant she's like knocked out |
| 8:20 PM | Don't tell them you did it i don't want you getting in trouble if they do accuse |
| 8:23 PM | im just so scared i know how bad it looks well it does to me |
| 8:37 PM | I understand if you think im hurting her i promise you im not tho but i can see if why if you do |
| 8:42 PM | Do you mean it i need the truth im telling you the truth |
| 8:45 PM | Ok baby thank you thank you |
| 9:39 PM | Your son close to getting out but its gonna feel like forever |
| 9:41 PM | I know |
| 9:43 PM | Its ok |
| 9:45 PM | I know but you cant |
| 9:47 PM | Yes |

In his first point, Appellant claims that the messages were illegally obtained because the search warrant affidavit attached to the warrant for the phone incorrectly stated where the phone was found and which officer actually seized it.

6

Citing code of criminal procedure articles 18.04(2) and 38.23, Texas constitution, article 1, section 9, and the Fourth Amendment to the United States Constitution, Appellant essentially argues that because the warrant for Ashley's phone contained errors, it was invalid; and without a valid warrant, the seizure of the phone was unreasonable under the Fourth Amendment.[2]

As the State correctly points out, however, Appellant has no standing to complain that the seizure of Ashley's cell phone—which, the record shows, she voluntarily relinquished to law enforcement—violated Appellant's constitutional rights. Proof of a "reasonable expectation of privacy" is at the forefront of all Fourth Amendment claims. *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004). Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government violated. *Id.*; *see Rakas v. Illinois*, 439 U.S. 128, 139, 99 S. Ct. 421, 428 (1978) (noting that the issue of standing involves two inquiries: first, whether defendant has alleged an "injury in fact"; second, "whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties"). One does

---

[2]Appellant does not argue that the Texas constitution affords any greater protection than the United States Constitution, so we treat his claim as resting on the latter. *See Brimage v. State*, 918 S.W.2d 466, 477 n.11 (Tex. Crim. App. 1994), *cert. denied*, 519 U.S. 838 (1996); *Rauscher v. State*, 129 S.W.3d 714, 723–24 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *Hulit v. State*, 947 S.W.2d 707, 709 n.3 (Tex. App.—Fort Worth 1997), *aff'd*, 982 S.W.2d 431 (Tex. Crim. App. 1998).

not have standing to complain about the invasion of someone else's personal rights. *Kothe*, 152 S.W.3d at 59 (citing *United States v. Salvucci*, 448 U.S. 83, 84–85, 100 S. Ct. 2547, 2549 (1980)). Only after a defendant has established his standing to complain may a court consider whether he has suffered a substantive Fourth Amendment violation. *Id.*; *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

Appellant has not shown that he personally had a reasonable expectation of privacy in Ashley's cell phone or the text messages recorded on it. *See Villarreal*, 935 S.W.2d at 138. The record shows that officers asked Ashley for her cell phone and that she gave it to them. Appellant presented no evidence showing that he had any ownership interest in the messages he sent to Ashley or that he took any steps to keep the messages private once he sent them to her phone. Accordingly, we hold that Appellant has failed to meet his burden to show that he personally had a reasonable expectation of privacy that the government violated, and we overrule his first point. *See Kothe*, 152 S.W.3d at 59.

In Appellant's second point, he argues that because Ashley was a co-defendant who had invoked her right not to testify at Appellant's trial, he did not have a chance to cross-examine her about the circumstances under which she had given her phone to the police and was therefore denied his constitutional right to confront a witness against him. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy

8

the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). But the Confrontation Clause is not implicated when a criminal defendant's own incriminating statements are used against him. *See, e.g.*, *Vasquez v. Kirkland*, 572 F.3d 1029, 1037 (9th Cir. 2009) (noting that the Fifth Amendment's right against self incrimination and not the Sixth Amendment's right to confront witnesses is implicated by use of a defendant's own statement), *cert. denied*, 130 S. Ct. 1086 (2010); *United States v. Brown*, 441 F.3d 1330, 1358–59 (11th Cir. 2006) (holding that admitting defendant's own statement did not violate Confrontation Clause because "a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination"), *cert. denied*, 549 U.S. 1182 (2007); *United States v. Lafferty*, 387 F. Supp. 2d 500, 511 (W.D. Pa. 2005) ("Inherent in Justice Scalia's analysis in the *Crawford* opinion was the idea that the right of confrontation exists as to accusations of third parties implicating a criminal defendant, not a criminal defendant implicating herself."). Furthermore, in the *Crawford* line of cases, the Supreme Court held that the Confrontation Clause was violated by a trial court's admitting statements that were testimonial *hearsay*. The statements Appellant claims the trial court erroneously admitted were his own statements recorded on Ashley's cell phone. By definition, a party's own statements offered against that party are admissions by a party-opponent—they are not hearsay. *See* Tex. R. Evid. 801(e)(2). Because Appellant's rights under the Confrontation Clause were

9

not violated by the admission of his own statements recorded on Ashley's cell phone, we overrule Appellant's second point.

## Jury Argument

In his third point, Appellant contends that the trial court erred by denying his motion for mistrial after sustaining one objection and instructing the jury to disregard and by overruling a second objection to remarks the prosecutor made during her closing argument. Appellant claims that by using the words, "I find" and "I hope," as set out below, the prosecutor improperly and harmfully "interjected her personal feelings in the final arguments" and that her interjection caused Appellant harm.

> MS FERGUSON [for the State]: I'm not even going to waste your time talking about the page [in the jury charge] on manslaughter and talking about how this might be a reckless act because I find that insulting.
>
> MR. RAY [for Appellant]: Excuse me. I object to what she finds.
>
> THE COURT: Sustained.
>
> MR. RAY: Ask the jury to be instructed to disregard that.
>
> THE COURT: Jury will disregard.
>
> MR. RAY: It's the second time she's done it. I didn't object the first time. I would respectfully ask for a mistrial.
>
> THE COURT: Overruled.
>
> MR. RAY: Thank you.
>
> MS FERGUSON: This is capital murder and nothing else. Capital murder is the only proper verdict in this case, because he

10

knowingly did these acts by doing what he did. By slamming her against whatever he slammed her against, anyone would know as a mother, as a parent, anyone would know that you can't do that and not harm your child. You can't do that and not kill your child.

Elena Contreras was two months old when she died. She didn't have a chance against this Defendant; her father. And I hope that by seeing fractures—

MR. RAY: Excuse me. She's interjecting her personal feelings, a third time.

THE COURT: Overruled.

MR. RAY: Thank you.

MS. FERGUSON: The fractures, everything you've heard from all the witnesses, all of the doctors, the autopsy reports, the CPS workers, they all believe this is capital murder.

The first remark that Appellant contends was an improper interjection of the prosecutor's personal feelings into the argument is "I find that insulting." The trial court sustained Appellant's objection, instructed the jury to disregard but denied Appellant's request for mistrial. The issue, therefore, is whether the trial court erred by denying a mistrial. Even if we were to assume the prosecutor's remark was improper, we cannot conclude that it was within that class of highly prejudicial and incurable errors that warrants the extreme remedy of a mistrial. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) ("A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors."). This is especially true in view of the trial court's prompt instruction to disregard, which in the absence of evidence to the contrary, we presume the jury followed. *See Gardner v. State*, 730 S.W.2d 675,

11

696 (Tex. Crim. App.), *cert. denied*, 484 U.S. 905 (1987). We overrule Appellant's third point as it relates to the first complained-of remark.

As far as the second remark, Appellant's objection swiftly cut it off before it was completed, so we cannot tell what it was going to be. All the prosecutor got out before Appellant rose to object was "I hope that by seeing fractures—". While we can assume the prosecutor was not going to say "I hope by seeing fractures you will vote not guilty," the point is that it is difficult to determine error, much less one that is harmful, from an incomplete remark. But even if we assume that the prosecutor intended to say that she hoped by seeing the fractures the jury would find Appellant guilty of capital murder, that would hardly have been news to anyone in the courtroom. It is not lost upon juries that prosecutors hope for a guilty verdict or that defendants and their counsel hope for an acquittal. Even if prosecutors are not supposed to inject their personal feelings into a case, we cannot hold in this case that the prosecutor's expressing to the jury her hope that it would find the evidence of fractures probative of the issue of Appellant's guilt affected any of Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S. Ct. 1466 (1999). This point is overruled.

**Conclusion**

Having overruled all of Appellant's points, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  WALKER,  MCCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 30, 2012