**Lonzo BASS aka Peoples, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 64130.**

Court of Criminal Appeals of Texas, En Banc.

May 20, 1987.

* *January,* supra at 220, Column 2, Line 2 to end.

Craig A. Washington, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. & Larry P. Urquhart & Ed Dodd, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is a direct appeal of a conviction for murder. Punishment was assessed at twelve years' confinement. Because of the nature of appellant's arguments on appeal, a short rendition of the facts of this case is necessary to understand the legal issues discussed in this opinion.

On April 24, 1978, Betty Lee Shields was getting her children ready for school when her boyfriend, Lonzo Bass, the appellant, came to her home. Appellant arrived at around 7:30 a.m. and drove two of Ms. Shields' children to school. It was Bass' normal routine to return to Shields' house after taking her children to school since he did not have to be at work until 2:00 p.m. Indeed, several neighbors testified that on the day of the murder they saw appellant drive up to the Shields' home at 8:30 a.m. in his maroon Chevrolet. Lem Greer, a friend of Shields, testified that he was talking to her on the phone around 8:00 a.m. when she said she had to hang up because her boyfriend was there. Around 10:30 a.m., neighbor Lizzie Johnson heard a couple of gunshots, and shortly thereafter, heard a car driving very fast down the street. Another of Shields' neighbors testified that she saw a maroon Chevrolet pulling away from the Shields' home at a high rate of speed at about 11:00 a.m.

Betty Shields' son, Michael, returned home from school early that day, around 12:45 p.m., because he was feeling sick. He did not have his house key, so he knocked on the door. No one answered. He thought his mother had gone somewhere so he sat outside the house and waited for her to return. By 6:00 p.m., Michael's two sisters had returned home from school and joined in his vigil, but there was still no sign of their mother. The children went to a neighbor's house, where they called their aunt, Beatrice Jones. When Mrs. Jones and her husband arrived, they broke into the Shields' house and discovered Betty Lee lying dead on the kitchen floor. A two-year-old child she had

been babysitting was found unharmed in the living room.

The police were summoned. When they arrived at the scene they found that the victim had been shot once in the back of the head. There was blood on the side of a space heater and on the carpet in the dining room. A .25 caliber bullet casing was found on the floor. The process of rigor mortis had already begun to affect the body.

Although several people, including the police, attempted to reach appellant on the day of the murder and on succeeding days, each attempt was unsuccessful. Appellant did not attend work and did not show up for Ms. Shield's funeral. Out of concern, appellant's family filed a missing person report on Tuesday, April 25. The Houston Police Department termed the report one of "investigative homicide," and it was assigned to Detective Donovan. At the time, Donovan was also investigating the murder of Betty Shields.

According to Detective Donovan, the appellant's sister called him early on the morning of Thursday, April 27 and asked him to meet her at appellant's house to see if appellant had been "dragged" (from the house) or possibly killed at his home like Ms. Shields. According to appellant's sister, Laura Bell Bass, Detective Donovan called her and asked her to meet him at appellant's house to look for some clue as to his whereabouts. At any rate, after Laura Bass and a few other relatives broke into appellant's house and obtained a key, they were met out front by Detective Donovan. Donovan testified that he did not know that the relatives had been in the house before he arrived and that he was invited into the house specifically to establish whether appellant's body was inside or appellant had been the victim of foul play. Laura Bell Bass did not know that her brother was a suspect in the murder of Betty Lee Shields; Detective Donovan did.

Donovan accompanied the relatives of appellant into the house and discovered that appellant was not home. Donovan testified that he then said, "We need something to see where he might be. Does he have any relatives, girl friends, or something where he might be?" Detective Donovan then helped look at "pictures, et cetera" belonging to appellant and started looking for "things" inside the house to determine where Lonzo Bass was. In a four or five-drawer chest of drawers located in a room of the house, Detective Donovan uncovered a box of .25 caliber bullets, pictures of Lonzo Bass and his family, and a receipt for a gun. There were also "assorted papers" and telephone bills in the drawer. Detective Donovan asked Laura Bass, whom he knew to have no interest in the house, if he could have permission to take five of the .25 caliber bullets and a picture of appellant. She permitted him to take the items, and he gave her a receipt. Renewed attempts to locate appellant were fruitless until he surrendered himself to police on April 29, five days after the murder.

Trial testimony reveals that the deceased died of a gunshot wound to the back of the head by a .25 caliber bullet. A firearms expert testified that there was a sixty-three percent probability that the bullet was fired from a "Raven Arms" brand pistol. The Houston Police Department's investigation revealed that some two years prior to the murder Lonzo Bass purchased a box of .25 caliber Remington Peters ammunition and a .25 caliber "Raven Arms" automatic pistol. The victim's son testified he had seen an automatic pistol in the glove compartment of Lonzo Bass' car. Ms. Shields' children testified that their mother had been dating appellant for two and a half years and that Lonzo Bass was a jealous person. Ms. Shields' daughter related that on the day before the murder appellant had become upset and had left the house.

In his first point of error, Lonzo Bass contends the trial court erred in admitting Detective Donovan's *testimony* concerning the items found by the detective in the chest of drawers. At trial, defense counsel agreed with the State that Detective Donovan was lawfully in the house and had authority to search appellant's home for his body or signs of foul play. Thus, no issue

of Laura Bass' consent is preserved for review. See, e.g. and compare *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (question preserved and discussed in light of common authority or other sufficient relationship to premises or effects).

Appellant maintains, however, that Detective Donovan should have limited the scope of his search of the premises to those areas of the house where it is conceivable that a body might have been hidden from view. Other than the detective's testimony that Laura Bass and other relatives expressed concern that Lonzo Bass might be dead in the house or have been dragged from it, no other emergency or exigent circumstances existed except Detective Donovan's desire to seek "clues" as to appellant's whereabouts. Based on defense counsel's argument and the evidence presented at defendant's pretrial hearing on a motion to suppress, the trial court excluded the bullets found in the chest of drawers. However, the judge also ruled that "the man was there, and I will let him testify as to what he did. I think he was there legally and lawfully." The trial commenced; Detective Donovan was thereupon called as the State's first witness and over defense objection that his testimony of the visual search was the same as the suppressed evidentiary items, he was permitted to testify that he searched the drawers and observed a box of .25 caliber Remington Peters ammunition with a price tag from Oshman's Sporting Goods.

■ A warrantless search must be strictly circumscribed by the exigencies which justify its initiation. *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978), quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Under the facts of this case, by exceeding the permissible scope of a search for appellant's body or signs of foul play, Detective Donovan rendered an initially good search bad. See *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (footnote 12); *Kremen v. United States,* 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957). The search is

not then made good again by what was observed among appellant's papers and effects or seized therefrom. See *Ker v. California,* supra. See also, *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

■ We hold that the trial court committed reversible error in admitting Detective Donovan's testimony (1) that he searched the chest of drawers and (2) that inside a drawer he found the box of .25 caliber bullets.

The case at bar is easily distinguishable from those which hold that a need to protect or preserve life or avoid serious injury is justification for what would otherwise be an illegal entry or search absent an exigency or emergency. See *Mincey v. Arizona,* supra, 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300, and numerous cases cited therein at footnote 6. See also, *Brown v. State,* 475 S.W.2d 938, 950 (Tex.Cr.App. 1971) (subsequent entry of rural home within 12 hour period of finding two murder victims there did not violate constitution). Any reasonable concern that appellant's house might have been the scene of his own murder was quickly dispelled by Detective Donovan and appellant's relatives when their search for his body or signs of foul play yielded nothing.

■ In *Corbett v. State,* 493 S.W.2d 940, 947 (Tex.Cr.App.1973), we recognized:

"Not every report of a homicide or violent injury gives rise to the operation of this [emergency] exception to the Fourth Amendment requirement of a warrant to enter and search a house. Often, there are circumstances which vitiate the need for quick response by the police, and take the problem completely out of the emergency context."

When Detective Donovan, knowing appellant to be a suspect in the murder of Betty Shields, satisfied himself that appellant had not been murdered at or dragged from his home, any circumstance requiring his quick warrantless response at that residence was vitiated. Moreover, police may seize any evidence *that is in plain view* during the course of their legitimate emergency activities. See, *Michigan v. Tyler,* 436 U.S. 499, 509–510, 98 S.Ct. 1942, 1949–1950, 56

L.Ed.2d 486 (1978); *Coolidge v. New Hampshire,* 403 U.S. 443, 465–466, 91 S.Ct. 2022, 2037–2038, 29 L.Ed.2d 564 (1971). Searching through photographs, receipts, papers and bills in a chest of drawers is simply not included within the constitutional ambit of the proffered "emergency" exception to the Fourth Amendment's requirement for a warrant.

Although we will reverse the case on the basis of our decision on the merits of appellant's first point of error, we are further urged to review the sufficiency of the evidence presented against appellant at trial. See, *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Ayers v. State,* 570 S.W.2d 926 (Tex.Cr.App.1978). Appellant does not maintain that all the evidence, proper and improper, is insufficient to support the conviction. See, *Porier v. State,* 662 S.W.2d 602, 606 (Tex.Cr.App.1984). Instead, like the appellant in *Collins v. State,* 602 S.W.2d 537 (Tex.Cr.App.1980):

> "... appellant ... tries to bootstrap himself into an acquittal by arguing first that a piece of evidence was admitted erroneously, and then that the erroneously admitted evidence must be discounted in considering the sufficiency of the evidence." *Id.* at 602 S.W.2d 539 (concurring opinion).

As a result, we must refuse to consider the sufficiency of the evidence under such circumstances and reverse and remand. *Porier v. State,* supra. See also, *Adams v. State,* 639 S.W.2d 942 (Tex.Cr.App.1982), and *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1980).

The judgment is reversed and the cause remanded.

DUNCAN, J., concurs in the result.

ONION, P.J., and WHITE, J., dissent.

W.C. DAVIS and CAMPBELL, JJ., not participating.