

# IN THE
## TENTH COURT OF APPEALS

### No. 10-08-00149-CR

**MELISSA MATUS,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the County Court at Law No. 1
McLennan County, Texas
Trial Court No. 20076115CR1**

## MEMORANDUM OPINION

A jury found Appellant Melissa Matus guilty of the offense of cruelty to an animal. The trial court assessed her punishment at ninety days in the McLennan County Jail and a $2,000 fine but suspended the sentence and placed her on community supervision for eighteen months. Raising five issues, Matus appeals. We will affirm.

The information alleged that on or about February 15, 2006, Matus "did then and there intentionally or knowingly fail unreasonably to provide necessary care for a horse in the defendant's custody, by failing to properly groom or treat or medicate … ."

At the time of the alleged offense, section 42.09 of the Penal Code provided: "A person commits an offense if the person intentionally or knowingly … fails unreasonably to provide necessary food, care, or shelter for an animal in the person's custody." Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887, 887 (current version at TEX. PENAL CODE ANN. § 42.09(a)(2) (Vernon Supp. 2010)). "'Necessary … care' includes … care provided to the extent required to maintain the animal in a state of good health." *Id.* at 888 (current version at TEX. PENAL CODE ANN. § 42.09(b)(6)).

## Sufficiency of the Evidence

In her first issue, Matus contends that the evidence is factually insufficient to show that she failed unreasonably to care for her horse. The court of criminal appeals recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard" and that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902, 912 (Tex. Crim. App. 2010). Accordingly, we will apply the *Jackson v. Virginia* sufficiency standard to this issue. *See, e.g., Valdez v. State*, --- S.W.3d ---, ---, 2010 WL 5269818, at *6 (Tex. App.—San Antonio Dec. 15, 2010, no pet. h.) (applying legal-sufficiency standard to factual-sufficiency complaint); *Kibble v. State*, --- S.W.3d ---, ---, 2010 WL 4910236, at *2 (Tex. App.—Houston [1st Dist.] Dec. 2, 2010, no pet. h.) (same).

When reviewing a challenge to the sufficiency of the evidence to establish the elements of a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our duty is to determine if the finding of the trier of fact is rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State,* 828 S.W.2d 418, 422 (Tex. Crim. App. 1992). In doing so, any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When performing a sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State,* 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson,* 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

*Failed unreasonably to care for the horse*

In 1995, Matus and her then-husband purchased "Paint," a stunted quarter-horse that was possibly part pony, for their daughter Kaitlyn. At that time, Paint's age was between fifteen and seventeen years. Paint was moved to Matus's property in 2003.

Evelyn Bench, an equine investigator with Habitat for Horses, a nonprofit organization that is a foster and rehabilitation home for horses, testified that she went to Matus's property in October of 2004 to get a horse (a palomino named Gusto) from Matus that was being donated. While there, Bench noticed Paint's long, wiry hair and told Matus that it might have Cushing's disease and that she might want to have her veterinarian check it. Matus replied that she would do so.

In the summer of 2005, Waco Police Detective Michelle Starr, a horse owner, was passing by Matus's rural property on a daily basis while driving to and from work. She could see Paint from the road and became concerned about Paint's condition because, despite the 100-degree heat, it still had curly long hair, and on her drives home, she saw it standing in water up to its belly. At that time, Paint looked chubby or fat. About six months later, in February 2006, Starr noticed that Paint had lost a lot of weight. Based on Paint's long hair, she thought it might have Cushing's disease, and with the weight loss, she was concerned that it was not getting any medical attention, which she thought it needed. Starr thus contacted a fellow detective, Donnie Morgan, who had experience with animal-cruelty cases, and asked him to go with her to look at Paint.

On February 14, 2006, Starr and Morgan drove to Matus's property. Morgan initially looked at Paint from the road through a camera lens and thought he looked "obviously sick." After observing Paint for about twenty minutes, Morgan thought that "something was wrong with this horse." When the horse tried to walk, it was like "walking on egg shells," "walking up on its toes, just real gingerly." Morgan and Starr walked up to the pen and climbed over the fence to get a closer look. Morgan and Starr

both said that Paint's tail and rear legs were crusted with diarrhea and its hooves were long, cracked, and needed trimming. Morgan took numerous photographs of Paint that were in evidence. Starr and Morgan both said that the two other horses in Matus's pens that day looked to be in good condition.

Morgan and Starr also noted that Paint's mane had a lot of cockleburs in it, and there was some type of knot or abscess on its head. Morgan said that Paint had really labored breathing and few teeth, and that its tongue was hanging out a little, which Morgan said was a sign that a horse or cow is about to die. Morgan concluded that Paint was acting as if it were suffering; he thought that it was in pain from walking and breathing. Morgan decided to seize the horse without a warrant because he thought the horse was about to die. No one was at Matus's adjacent mobile home, and Morgan could not reach her by phone, so he left his card in her mailbox with a note that he had taken her horse.

Starr attended the post-seizure hearing before a justice of the peace, and she said that Matus testified that she was not aware that Paint had Cushing's disease and that she was not seeking medical treatment for the horse. Morgan also attended that hearing, and he said that Matus testified that she knew that Paint had been ill for five to six years and that she "was her own veterinarian."

Paint was boarded with a non-equine veterinarian for a day and then was taken to Dr. Ronnie Edwards, an equine veterinarian. After about ten days, Dr. Edwards euthanized Paint. Dr. Edwards testified that because of Paint's emaciated condition and long hair, he immediately suspected Cushing's disease (or syndrome). Paint then tested

positive for Cushing's disease, which is a disease of the pituitary gland and leads to diabetes, which then causes laminitis. Its symptoms include weight loss, muscle loss, weakness, hirsutism (long hair), depression, lethargy, excessive thirst and hunger, and breakdown of the ligamentous structures of the leg. The cause of Cushing's is unknown, and while it is treatable, it is not curable. Dr. Edwards said that Matus did not cause Paint to get Cushing's. Once Cushing's reaches a certain stage in older horses, its symptoms are largely irreversible.

Dr. Edwards assessed Paint's body condition with a score of 2, explaining that horses are scored on a scale of 1 to 9, with 0 being a horse that has died from malnutrition and 10 being a horse that has died from being overweight. Most horses are scored at a 5 or 6. Paint's life expectancy at that time was probably "not very long" and real cold weather would have led to its death from hypothermia because of lack of fat and muscle. And if a horse like Paint were to go down to the ground in real cold weather, it would not have been able to get back up because of the weakness. Also, Paint's teeth were in "very bad" shape. In addition to missing teeth, Paint's teeth had not been floated (grinded and smoothed so the horse can grind grain and swallow it). Dr. Edwards thought that Paint's teeth had never been floated, but if they had been, it had been at least two or three years. Floating Paint's teeth and a correct diet for an older horse would have helped Paint's diarrhea and constipation problem.

Dr. Edwards said that Paint's hooves were not in good shape; they were not kept trimmed and that they showed signs of founder (laminitis), which is linked to Cushing's and diabetes. Contrary to Morgan's testimony, Dr. Edwards said that Paint

walked "pretty good." Dr. Edwards confirmed that Paint had lots of cockleburs in its main and dried feces on its back legs.

Cushing's is treated with Pergolide, a human medication, which costs between $1.50 and $3.00 a day, depending on where one buys it. Dr. Edwards said that Pergolide would have helped Paint's condition but that its other problems (diet and teeth) would have needed to be addressed also. If Paint's Cushing's had been treated earlier, the horse "probably would have done better" and could probably have had "a few more years of quality life." Dr. Edwards believed that Matus had not cared for Paint—"he was in bad shape." He could not say that Paint was suffering, but it was uncomfortable.

On cross-examination, Dr. Edwards answered hypothetically that if Paint were being brushed periodically, fed and provided water daily, given pain medication, and kept stress-free, he would not think the owner was mistreating, being cruel, or not caring for the horse. But on re-direct, Dr. Edwards said that the horse's condition would have indicated that something was wrong or that the horse might have Cushing's and that he would have recommended to the owner of a horse in Paint's condition to take the horse to a veterinarian and not to try to treat the horse on their own.

Clay Link, Matus's ex-boyfriend, testified that he helped Matus care for Paint during their year-and-a-half relationship in the 2003 and 2005 time frame. Link lived on Matus's property then, and during the week he and Matus cared (fed, watered, and groomed) for Paint, and Matus's daughter Kaitlyn cared for it on the weekends. They

had a farrier come out to care for Matus's horses' feet. Paint's condition in 2004 was "pretty good." Marc Scott, a farmer and rancher who lived near Matus, delivered hay every week or two to Matus for her horses starting in October 2005. He noticed that Paint had lost weight and discussed it with her, and Matus told him that Paint had some kind of disease. He said that Matus appeared to care for Paint, but after being shown a photo of Paint when it was seized, Scott said he would probably have taken it to a veterinarian if the horse were his. Kaitlyn Matus testified that she thought her mother adequately took care of Paint. She had seen Paint the weekend before it was seized. The horse was skinny, but "he was getting bigger, like he looked like he had put on some weight, so we thought he was doing pretty good."

Matus testified. She has had or has owned horses her whole life. She first noticed something was wrong when Paint did not shed its winter coat in 2004, and she clipped its hair that summer and in the summer of 2005. Matus explained that Paint's hair was long in February of 2006, when it was seized, because horses are not clipped in the winter, a fact agreed to by Dr. Edwards. She also explained that because of the cold weather in January and February of 2006, it had not been feasible to wash the feces off Paint's rear legs and tail, and at the time she was waiting for a warm day to do that.

She suspected that Paint had Cushing's, and she spoke with several people about it and researched it on the Internet. She first said that she noticed that Paint had lost weight in January of 2006, but then later said it was in the Fall of 2005 when she realized the weight loss and changed Paint's feed to increase the protein level, but the increase was too sudden and it gave Paint diarrhea. She then changed its ration a little. Matus

gave Paint "Bute," a pain reliever for horses, when it appeared to be lame or to not be feeling well, and it seemed to help. She regularly "picked" her horses' feet and did some basic trimming and rasping, but she usually had a farrier care for their feet. Given Paint's age and the cost of treatment, Matus said she made Paint "comfortable." At that time, Matus was "barely making ends meet." Because of her job, she was leaving home before daylight and getting home after dark, so she did not see her horses every day. An ex-boyfriend was watering and feeding her horses.

On cross-examination, Matus admitted that Paint was never seen by a veterinarian for Cushing's. She also admitted that Paint was dirty from the feces and that Paint's teeth had not been floated "lately." Matus said that giving Paint away was not an option because it belonged to her daughter. She admitted to telling Morgan that Paint "had the right to die in the pasture."

The jury was correctly instructed that, regarding the offense of intentionally or knowingly failing unreasonably to provide necessary care for an animal, "necessary care" includes "care … provided to the extent required to maintain the animal in a state of good health." There was ample testimony that Paint was not in a state of good health, and Dr. Edwards gave detailed testimony about what Matus could have done to improve Paint's quality of life. He also said that Matus should have had Paint seen by a veterinarian.

As for Matus's tacit argument that she lacked the resources to provide Paint the veterinary care that was needed, the law provided no such excuse, as the State argued at trial. *See, e.g.*, *Martinez v. State*, 48 S.W.3d 273, 276, 277 n.1 (Tex. App.—San Antonio

2001, pet. ref'd) ("Failure to provide necessary care is cruelty to animals and a criminal offense, even though the record in this case reveals neglect arising out of a lack of resources rather than outright cruelty."); *see also id.* at 278 (Lopez, J., concurring).

We recognize that the jury was faced with some conflicting evidence, but the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State,* 125 S.W.3d 661, 670 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The jury may believe all, some, or none of any witness's testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). We must defer to the jury's determination concerning what weight to give contradictory or conflicting testimonial evidence. *See, e.g., In re A.B.,* 133 S.W.3d 869, 873-74 (Tex. App.—Dallas 2004, no pet.); *Scugoza v. State,* 949 S.W.2d 360, 362-63 (Tex. App.—San Antonio 1997, no pet.).

Viewing the evidence in the light most favorable to verdict, we conclude that a rational jury could have found that Matus failed unreasonably to care for Paint. The evidence on that element of the offense is sufficient. We overrule issue one.

*Mens rea*

Issues two and three assert that the evidence is legally and factually insufficient to show that Matus acted intentionally and knowingly. As discussed above, because we no longer review the evidence for factual sufficiency, we overrule issue three and will proceed to a sufficiency review for issue two under the *Jackson v. Virginia* sufficiency

standard.

Cruelty to animals is a "nature of the conduct" offense. *See Amaya v. State*, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986). A person acts intentionally with respect to the nature of the conduct when the person has a conscious objective or desire to engage in the conduct; a person acts knowingly when he is aware of the nature of his conduct. TEX. PENAL CODE ANN. § 6.03(a), (b) (Vernon 2003). Proof of a culpable mental state almost invariably depends upon circumstantial evidence. *Krause v. State,* 243 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). A jury may infer a culpable mental state from the circumstances surrounding the offense of cruelty to animals. *Martinez,* 48 S.W.3d at 276 (citing *Pine v. State,* 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd)).

A jury could infer a culpable mental state from the circumstantial evidence of Paint's physical condition. *See Martinez,* 48 S.W.3d at 276 ("Here, the evidence indicates obvious and severe illness, and a long-neglected need for treatment. Presented with such an obvious need for treatment, a jury could easily infer intent or knowledge."). Further evidence of Matus's culpable mental state came from several witnesses. Bench testified that when she told Matus that Paint might have Cushing's and that she might want to have her veterinarian check it, Matus replied that she would do so. Starr testified about the palomino that Bench had come to get, stating that she had noticed it to be "emaciated, really skinny," and it "looked like he was starving." Starr contacted the Sheriff's Department to complain, which led to Matus giving that horse away. Finally, Matus admitted that she suspected Paint had Cushing's, researched it, and

decided to treat it herself and not to have a veterinarian see the horse. These admissions showed Matus's deliberateness and purpose in how she chose to treat Paint.

Viewing the evidence in the light most favorable to verdict, we conclude that a rational jury could have found that Matus acted intentionally or knowingly in failing unreasonably to care for Paint. *See Martinez*, 48 S.W.3d at 276-77; *see also Pine*, 889 S.W.2d at 629-30. The evidence on a culpable mental state is sufficient. We overrule issue two.

### Charge Error

In her fourth issue, Matus contends that the trial court fundamentally erred in failing to tailor the jury charge so as to restrict the mens rea instruction to "nature of the conduct." In the instructions on the culpable mental states, the abstract portion of the charge included "result-oriented" instructions with the "conduct-oriented" instructions:

> A person acts intentionally, or with intent, with respect to the nature of his conduct *or to a result of his conduct* when it is his conscious objective or desire to engage in the conduct *or cause the result*.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct *or to circumstances surrounding his conduct* when he is aware of the nature of his conduct *or that the circumstances exist*. *A person acts knowingly or with knowledge with respect to a result of his conduct, when he is aware that his conduct is reasonably certain to cause the result.* [Emphases added.]

In analyzing a jury-charge issue, we first decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Referring to the result-oriented portions in the above abstract paragraphs as "superfluous," the State does not expressly concede that error exists, but it does argue that reversible error does not exist under

applicable case law.

We recently examined a nearly identical charge issue and the State's same response:

> The court properly included abstract definitions in the charge for both "intentional" and "knowing" conduct. However, the court erred by failing to limit these definitions to the nature of the defendant's conduct rather than the result of his conduct. *See Hughes*, 897 S.W.2d at 296; *Battaglia*, 2007 WL 4098905, at *2; *Whitfield*, 2001 WL 40654, at *1; *Rodriguez*, 24 S.W.3d at 502. Because Garcia failed to object, reversal is required only for egregious harm. *Trejo v. State*, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009); *Battaglia*, 2007 WL 4098905, at *1; *Whitfield*, 2001 WL 40654, at *2; *Rodriguez*, 24 S.W.3d at 503.
>
> Citing *Plata v. State*, the State characterizes each of these abstract definitions as a superfluous instruction which "never produces reversible error in the court's charge because it has no effect on the jury's ability fairly and accurately to implement the commands of the application paragraph." 926 S.W.2d 300, 302-03 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997). However, the Court in *Plata* also observed, "Reversible error only occurs in the giving of an abstract instruction when the instruction is an incorrect or misleading statement of a law which the jury must understand in order to implement the commands of the application paragraph." *Id.* at 302. Here, Garcia's complaint potentially fits within the category of "reversible error" identified in *Plata* because the challenged definitions were incorrect with regard to the culpable mental state which the jury must find in order to convict him of indecency by contact. And this error is magnified to the extent that the application paragraph itself misstates the requisite culpable mental state.
>
> Thus, we will examine the record for egregious harm under the standard first enunciated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *See Dougherty v. State*, No. PD-1411-05, 2006 WL 475802, at *1 (Tex. Crim. App. Mar. 1, 2006) (per curiam) (not designated for publication).

*Garcia v. State,* No. 10-09-00162-CR, 2010 WL 1269689, at *2-3 (Tex. App.—Waco Mar. 31, 2010, no pet.) (mem. op., not designated for publication).

Because cruelty to animals is a conduct-oriented offense, the charge's abstract portion was erroneous by including result-oriented definitions with the conduct-oriented definitions. *See id.* at *2.

Because Matus did not object to the charge, we analyze this error under the familiar *Almanza* standard. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). Unobjected-to jury charge error will not result in reversal of a conviction in the absence of "egregious harm." *Almanza,* 686 S.W.2d at 171. In examining the record for egregious harm, we consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and the weight of the probative evidence; (3) the final arguments of the parties; and (4) any other relevant information revealed by the record of the trial as a whole. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

The application paragraph in this case was correct, and the charge correctly instructed the jury on the substantive law for the offense of cruelty to animals, thus informing the jury of what the State had to prove. *See Garcia,* 2010 WL 1269689, at *4. Within the context of the charge as a whole, the error appears less harmful. *See id.*

The evidence on Matus's conduct and Paint's condition was contested, but, as we found above, the evidence was sufficient to support the conviction. Matus argues that the State focused much of its evidence on the "result" of Matus's conduct, but that is not necessarily true. The State did not present evidence or argue that Matus caused Paint to

get Cushing's or that she wanted Paint to suffer or to be in bad health. Instead, to meet

its burden of proof, the State presented evidence that Paint was not in a state of good

health.[1] The evidence on Paint's condition was thus necessary for the jury to determine

the reasonableness of Matus's conduct. For this same reason, the State's emphasis in

closing argument on Paint's condition was likewise not inappropriate. Accordingly, we

find that Matus did not suffer egregious harm and overrule issue four.

## Motion to Suppress

In her fifth issue, Matus contends that the trial court abused its discretion in

overruling her motion to suppress evidence of Detective Morgan's warrantless entry

into her horse pen and warrantless seizure of Paint. It is undisputed that Morgan went

on to Matus's property and seized Paint without a warrant.

We review a trial court's ruling on a motion to suppress evidence under a

bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App.

2007). In reviewing the trial court's decision, we do not engage in our own factual

review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118

S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of

fact and judge of the credibility of the witnesses and the weight to be given their

testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). Therefore, we

give almost total deference to the trial court's rulings on (1) questions of historical fact,

even if the trial court's determination of those facts was not based on an evaluation of

---

[1] "'Necessary … care' includes … care provided to the extent required to maintain the animal in a state of good health." Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887, 888 (current version at TEX. PENAL CODE ANN. § 42.09(b)(6)).

credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673.

When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Kelly v. State*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Id.* at 818-19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 819.

The suppression hearing took place at the end of the first day of trial testimony. Only Morgan testified, but in making its ruling and stating its findings on the record, the trial court also referred to the testimony of Detective Starr, who had testified that day, as had Dr. Edwards. Also, Morgan's trial testimony included testimony about his entry onto Matus's property and into her horse pens.

> In a review of a trial court's suppression hearing ruling, we generally consider only the evidence adduced at the suppression hearing. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

> However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits. *Id.* [*Hardesty v. State*, 667 S.W.2d 130, 135 n.6 (Tex. Crim. App. 1984).] Where the State raises the issue at trial either without objection or with subsequent participation in the

> inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review. *Id.* at 135; *See also Webb v. State,* 760 S.W.2d 263, 272 n.13 (Tex. Crim. App. 1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). Moreover, it would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless. TEX. R. APP. P. 81(b)(2).

*Id.*

*Kearney v. State,* 181 S.W.3d 438, 446 (Tex. App.—Waco 2005, pet. ref'd); *see also Gutierrez v. State,* 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). We agree with Matus that the parties consensually relitigated the suppression issue at trial, and to the extent necessary, we will consider trial evidence as part of the suppression record.

On appeal, the State advances several theories in support of the trial court's suppression ruling. We focus only on the "emergency doctrine" exception to the warrant requirement, as we find that it supports the trial court's findings and ruling.

> The emergency doctrine is an exception to the constitutional prohibition of searches and seizures carried out without a warrant from a magistrate. *Bray v. State,* 597 S.W.2d 763, 764 (Tex. Crim. App. 1980). The Fourth Amendment does not prohibit a warrantless search and seizure when there is a need to act immediately to protect or preserve life, or to prevent serious injury. *Id.; see also Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

*Pine,* 889 S.W.2d at 631.

Under the emergency doctrine, a warrantless entry is permitted if the officer has an immediate, reasonable belief that he or she must act to "protect or preserve life or avoid serious injury." *Laney v. State,* 117 S.W.3d 854, 861 (Tex. Crim. App. 2003) (quoting *Mincey,* 437 U.S. at 392, 98 S.Ct. at 2412).

"We have used an objective standard of reasonableness in determining whether a warrantless search is justified under the Emergency Doctrine. *Brimage,* 918 S.W.2d at 501; *Colburn,* 966 S.W.2d at 519. This objective standard looks at the police officer's conduct and "takes into account the facts and circumstances known to the police at the time of the search." *Brimage,* 918 S.W.2d at 501 (citing *Garcia v. State,* 827 S.W.2d 937 (Tex. Crim. App. 1992); *Janicek v. State,* 634 S.W.2d 687, 691 (Tex. Crim. App. 1982)); *Colburn,* 966 S.W.2d at 519. Furthermore, we look to ensure that the warrantless search is "strictly circumscribed by the exigencies which justify its initiation." *Mincey,* 437 U.S. at 393, 98 S.Ct. at 2413; *Bass v. State,* 732 S.W.2d 632, 635 (Tex. Crim. App. 1987). If the emergency doctrine applies, the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408 (citations omitted); *Brimage,* 918 S.W.2d at 501.

*Id.* at 862.

In an animal cruelty case, to justify the warrantless seizure under the emergency doctrine, the State must show (1) that the officer had probable cause to believe the animal was being cruelly treated, and (2) that obtaining a warrant was impracticable because the officer reasonably believed there was an immediate need to act to preserve a life. *Pine,* 889 S.W.2d at 631 (citing *Brimage v. State,* 918 S.W.2d 466, 500 (Tex. Crim. App. 1994) and *Crane v. State,* 786 S.W.2d 338, 346 (Tex. Crim. App. 1990)).

At the suppression hearing, Morgan testified that he had been a peace officer for twenty-three years and had been around horses for most of his life. He has owned fifteen horses. He attended a course on the health and safety of horses in 2002, and from that course he was certified to perform body condition and health and condition ratings on animals in the field.

As a result of Starr's concerns about Paint's condition, they drove together to Matus's property. He was able to view Paint from the road passing Matus's property

by using his zoom camera lens. He observed Paint for about twenty minutes and saw Paint's tongue hanging out, its head hanging down, and its long hair, along with dried feces on its rear. He observed Paint's labored walking (like it was walking on egg shells) and thought it was lame from laminitis.

They then drove onto Matus's property, turned into her driveway, and parked next to her mobile home. They then walked up to the adjacent horse pen, and Morgan climbed on the fence to better observe Paint. He noticed a knot on the side of Paint's face and that its eyes were half closed. Morgan next opened the gate and went into the pen to look in Paint's mouth to ascertain its age. Morgan did not go into the barn, but he did not see any feed or hay in the pen for the five horses there. He saw one thirty-gallon water bucket that was half-full.

Based on his observations of Paint and his training and background, Morgan believed that Paint was in imminent danger and was about to die, and he thought that it might die in the six- to eight-hour time period that it would take him to get a warrant. Morgan thus decided to seize the horse and get it to a veterinarian. He called the Sheriff's Department, which he had an arrangement to work with on animal cruelty cases, and a person was called to come and get Paint. That person typically puts seized animals on his place if they are in good enough condition, but when he saw Paint, he refused to take it to his place and thus took it directly to Dr. Jager, a non-equine veterinarian, where it stayed for a day before being taken to Dr. Edwards.

In denying the suppression motion, the trial court made an oral finding of emergency based on Starr's and Morgan's testimony, the photographs of Paint, and the

fact that Paint was soon euthanized. Relying on *Pine*, Matus argues that Morgan's lay opinion on Paint's condition was not enough to justify seizure under the emergency doctrine and implies that expert testimony from a veterinarian is necessary. *See Pine*, 889 S.W.2d at 631-32. We agree with the State that *Pine* did not establish a veterinarian requirement; that case's emphasis on the veterinarian's opinion related to its analysis of the reasonableness of the officer's belief that, given the need to protect the colt's life, obtaining a warrant would be impracticable. *See id.* at 632. Also, the officer had sought the veterinarian not to justify seizure under the emergency doctrine, but to begin treating the colt. *Id.* at 631.

Viewing the evidence in the light most favorable to the trial court's ruling, we cannot say the trial court abused its discretion in finding the emergency doctrine applicable and in thus denying the motion to suppress. We overrule issue five.

Having overruled all of Matus's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray
        and Justice Davis[2]
Affirmed
Opinion delivered and filed March 30, 2011
Do not publish
[CR25]

---

[2] The Honorable Felipe Reyna, a former justice on this court, was on the panel and present for argument, but having left office on December 31, 2010, he did not participate in this decision. *See* TEX. R. APP. P. 41.1(c).